## UNITED STATES v. GOLDEN.

Circuit Court of Appeals. Tenth Circuit.
August 1, 1929.

No. 22.

Lawrence A. Lawlor, Atty. U. S. Veterans' Bureau, of Washington, D. C., and H. S. Bowman, Asst. U. S. Atty., of Santa Fe, N. M. (John W. Wilson, U. S. Atty., of Albuquerque, N. M., on the brief), for the United States.

J. S. Vaught, of Albuquerque, N. M., and George W. Hay, of Silver City, N. M., for appellee.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge. This is an action on a war risk insurance policy. The plaintiff claimed permanent and total disability dating from 1919. The government denied such claim and asserted that even so, the soldier had lost his right by converting his term policy into an ordinary life policy in 1926. The trial court found for the plaintiff, and this appeal results.

The whole case is clouded by a mistake plaintiff labors under, a confusion of war risk insurance and compensation. It appears at length in his amended complaint, in the testimony, and apparently in the findings of the trial court. In his amended complaint, instead of simply alleging a permanent and total disability while the policy sued on was in force, the plaintiff set out in detail the various "ratings" of the government for purposes of compensation. Counsel for the government promptly detected the error, and moved to strike all the allegations as to "ratings" for compensation, and in support thereof said:

"That the first grammatical paragraph 6 of said amended complaint should be stricken because the said war risk insurance matures either upon the permanent total disability or death of the insured while the said insurance is in force and effect and it is immaterial whether the disability or death is due to the military service of the insured or whether any rating was ever given the said insured and therefore the said allegations in the said paragraph are immaterial and irrelevant, and do not constitute a cause of action against this defendant."

The government is quite right in this contention. While the laws as to compensation and insurance are administered by separate divisions of the Veterans' Bureau, and while the beneficent provisions of both laws are confined to war veterans, there the similarity

ends. Compensation flows from service, like pensions of old, and the soldier is not consulted in the matter. Insurance is a contract, and the soldier takes it or leaves it alone; if he takes it, he pays for it, and his benefit is proportional to his payment. White v. U. S. 270 U. S. 180, 46 S. Ct. 274, 70 L. Ed. 530. Compensation benefits are paid to veterans to compensate them for a loss of ability to follow their pre-war occupation. It is only payable when the incapacity is traceable to a service origin and in line of duty. Compensation is "rated" in percentages, from nothing to 200 per cent., and is figured on comparative inability to follow a pre-war occupation. When the disability occurs is immaterial, save that it must be traceable to service origin. The amount of benefits paid are the same to all equally disabled.

On the other hand, insurance benefits go only to those who have bought and paid for policies of insurance. The amount paid depends on the amount of insurance bought. There are no degrees of disability recognized by the insurance contract—no "ratings" made. An insured must be totally and permanently disabled, or he recovers nothing; 90 per cent. disability avails him not. Nor does his disability depend upon his ability to follow his pre-war occupation; he must be disabled from following "any substantially gainful occupation." Service origin is immaterial in insurance. If he is totally and permanently disabled while his insurance is in force, he recovers, regardless of its origin. A total disability directly traceable to service origin will not entitle him to recover, unless it occurred while his insurance was in force.

Another striking difference is that Congress has conferred no jurisdiction upon the courts to determine disagreements over compensation, and the Supreme Court has held there is no such jurisdiction, "at least unless his [the Director's] decision is wholly unsupported by the evidence, or is wholly dependent upon a question of law or is seen to be clearly arbitrary or capricious." Silberschein v. U. S., 266 U. S. 221, 225, 45 S. Ct. 69, 71 (69 L. Ed. 256). On the contrary, Congress expressly placed upon the courts the duty of deciding claims under insurance policies in case of disagreement of the parties. Section 19, World War Veterans Act, as amended by Act March 4, 1925, § 2 (43 Stat. 1302, 38 USCA § 445). Necessarily, therefore, the fact that the Bureau does not believe a man is permanently and totally disabled does not conclude the case where a claim is made on an insurance policy; such belief starts the case in the courts, for, if the Bureau believed he was totally and permanently disabled, there would be no disagreement and no jurisdiction. This is spelled out in McGovern v. U. S. (D. C.) 294 F. 108, where Judge Bourquin allowed a recovery, notwithstanding a rating by the Bureau of no disability, and the judgment was affirmed (C. C. A.) 299 F. 302, and writ of error dismissed, 267 U. S. 608, 45 S. Ct. 351, 69 L. Ed. 812. Judge Bourquin said:

"Incidentally, the Bureau's determinations are not final; the statute (section 1, Act May 20, 1918, 40 Stat. 556, Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514kk), providing that, in event of disagreement between the Bureau and insured, action like this at bar may be brought. Therein the whole matter is at large and open to contention, the proceeding in no sense a review of the Bureau's judgment. The statute prescribing no procedure, the rule as usual is that the action will be assimilated to like actions, here, against the United States, and so in accordance with the Tucker Act (24 Stat. 505)."

█ This is enough to indicate the immateriality of "ratings" for compensation in an insurance case. The doctors making the "ratings" are of course competent witnesses, just as doctors examining for other purposes are; but it is their testimony that is competent, and not the Bureau's "rating" predicated thereon. While the motion to strike should have been sustained, the error has resulted in no prejudice, save the necessity of clearing up the resulting confusion.

Another confusing circumstance is the fact that the amended bill not only sets up the plaintiff's claim, but also the defense and the plaintiff's reply thereto. Upon oral argument, we are advised that originally the action was at law, and there is in the record a stipulation waiving a jury trial. Issue was joined as to the release of the claim by the application and acceptance of the new policy, and the plaintiff's claim of mutual mistake thereto. An equitable issue was thus presented, which must be tried by the chancellor and disposed of, before the remaining issues can be tried at law. Upon this situation developing, plaintiff's counsel took leave to file an amended complaint, in which he set up his claim, anticipated the government's defense, and his reply thereto; the entire case was then transferred to the equity side. However, this unusual situation in the pleadings presents no obstacle to a consideration of the controversy as actually presented by the record.

The controversy may be thus summarized: (1) The plaintiff alleges the existence of a policy of insurance in 1919; that he became permanently and totally disabled at that time. The government admits the policy existed at that time, but denies the disability. That is the first issue, and presents a legal question. (2) The plaintiff alleges a disagreement; the government denies it. That is the second question, a legal one. (3) The government alleges a discharge by virtue of a surrender of the contract sued on, and acceptance of a converted policy, and estoppel. The plaintiff alleges mutual mistake, fraud, etc. That is the third issue, an equitable one. (4) The defense also alleges lack of a necessary party, the Director of the Veterans' Bureau, and plaintiff's failure to first ask for or receive a surrender of the converted policy.

■ Upon the first issue, the trial court found that the plaintiff became totally and permanently disabled on November 1, 1919. The testimony affords ample support for this finding. Aside from plaintiff's evidence, which alone is sufficient, it appears from the government records that he was diagnosed as an active pulmonary tubercular in June, 1918, and sent to an army hospital; that in October, 1919, he was discharged from the army on account of tuberculosis; that from May, 1922, to January 1925, the government conceded his disability was permanent and total and paid him his insurance installments. His condition was then thought to be arrested, and he started vocational training in May, 1925, light work in a cleaning and pressing establishment. Even that work brought on hemorrhages, and the government stopped his training in August, 1925, and in November, 1925, declined to accept premiums on his policy because of his permanent and total disability. Shortly after that, he was advised that this ruling had been changed to a total temporary disability, and he should again pay his premiums. He did so, but demanded a review of his entire case "for the purpose of receiving the benefits of his insurance." The government declined to pay. His condition has not improved. From this short statement, it will be seen that he was totally disabled, and concededly so from the year 1918, to late in 1925, except for a few months' duration, during which few months, even very light work brought on a serious relapse. His condition during these months— the only period in this stretch of years that the government did not concede his total disability—is described in the government's brief as follows:

"During his employment in such vocational training he was in poor physical condition and repeatedly had hemorrhages and severe pains in the chest and back."

There is also the question of its permanence. The regulation that became part of his contract provided that disability is total when it is "impossible to follow continuously any substantially gainful occupation." It is permanent "whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the persons suffering from it." We are satisfied that the trial court's finding of total and permanent disability is amply supported by the evidence. The government, in its brief, states, that "the testimony in this regard was conflicting, and we assume that the findings of the court with relation to the physical condition of the plaintiff, would be binding upon the defendant."

■ On the second issue, that of disagreement, the trial court found for the plaintiff. The evidence recited above shows a demand by the soldier for his insurance benefits in the late fall of 1925; he did not get them. The government, which is here stoutly denying his right to recover on the merits, does not seriously contend that a disagreement does not exist, but urges the point more in connection with the necessity of a surrender of his new policy, and a demand therefor, which will be noticed later. The government's position on disagreement is stated in each of its two briefs filed herein. In one, it is urged that the trial court's finding as to disagreement is unsupported by the evidence, and counsel say:

"There is no evidence in the record to justify such a finding of facts as the testimony shows that the plaintiff had never submitted the converted insurance policy to the Veterans' Bureau or the Director, with a request that the said converted policy be canceled, and the war risk insurance contract be reinstated and that his rights should be determined by the said war risk contract and not by the said converted policy of insurance."

And in the second brief it is said:

"And that said petition does not allege any disagreement between the said plaintiff and the said United States Veterans' Bureau as to his alleged right to have his converted policy of insurance canceled because of fraud and misrepresentation."

But the jurisdictional disagreement required is over the "claim"; that is, for the insurance benefits. The law does not require that a plaintiff shall submit to the Bureau, for formal disagreement, questions incidental

to defenses. That there was a disagreement here over the payment of the claim is not seriously disputed; in fact, the briefs advise that the original answer amended it. But in any event the evidence justifies the finding.

The plaintiff having established his total and permanent disability since November, 1919, and that he should have been paid each month since then, we come to the affirmative defense, to wit, that he has lost his rights by his act of applying for and receiving a converted policy in the spring of 1926. While the allegations as to these matters appear as an anticipated defense in the amended complaint, the fact still remains that what the plaintiff wants is his money under his first policy; all other relief prayed for is purely incidental thereto. The plaintiff claims his first policy matured in 1919; the defendant denies it, and further alleges an estoppel and a discharge. The controversy is over the money claim under the 1919 policy; the jurisdiction given the court to determine that controversy gives it power to determine defenses. The facts are these:

The insurance authorized during the war was yearly term insurance, renewable for a limited time after the end of the war. This time limit was extended by various acts of Congress, the one governing this case being the act of June 7, 1924, § 301, as amended by the Act of March 4, 1925, § 13 (title 38 U. S. C. § 512 [38 USCA § 512]). It provides that not later than July 2, 1926, "all term insurance * * * shall be converted. * * * All term insurance shall cease on July 2, 1926, except when death or total permanent disability shall have occurred before July 2, 1926."

The plaintiff was notified by the government that he must either convert his insurance or drop it; the amended answer of the government alleges:

"Defendant further alleges that it was necessary and essential that the said plaintiff convert his said policy of insurance into another and different form of insurance on or before the 2d day of July, A. D. 1926, and defendant further alleges that the notice mailed and given to the said plaintiff relative to the conversion of the said policy of insurance was so mailed and given for the protection and safety of the said plaintiff in order that the said plaintiff would have an opportunity to convert his said policy of insurance prior to its final and permanent lapsing on July 2, 1926."

At the time he received the notices to convert, he was totally disabled, but the government doctors believed his condition was temporary. On the 28th of the preceding September, the government doctors at Albuquerque advised him, through the regional office, that his disability was both total and permanent. He was likewise advised direct from Washington, on November 11, that his disability was total and permanent. About a week later, however, the government doctors advised him his disability, while total, was temporary. This was the situation when he received the notices to convert. He took his application to convert to the Veterans' Bureau, and they gave him the information contained therein. There is no misstatement of fact in the application. The pertinent questions and answers are:

"Q. Have you ever made application for government compensation or pension? A. Yes.

"Q. Are you now disabled on account of injury or disease? A. Yes."

The trial court made the following findings of fact:

"That the rating of total permanent disability was changed by the defendant on February 28, 1925, and plaintiff was rerated as temporary partial disability, which rating continued to August 20, 1925, on which date plaintiff was rerated by defendant as temporary total disability.

"That about four months prior to July 1, 1926, plaintiff received several notices from defendant advising him that his said policy of insurance would have to be converted prior to July 2, 1926, and that unless the said policy was surrendered and application for conversion made prior to said date his said policy of insurance would be canceled; that plaintiff acted upon defendant's direction as aforesaid and made a written application to defendant for conversion of said policy to become effective July 2, 1926, and that in so doing plaintiff followed the directions of the defendant; and that thereafter defendant issued to plaintiff an ordinary life government insurance policy, effective July 1, 1926, as described in amended complaint marked Exhibit B.

"That the ratings made by defendant as to plaintiff's physical condition were all wrongful, misleading, and unjust with the exception of the rating of total permanent disability made by the defendant and mentioned above; that the actions of defendant in directing plaintiff to apply for converted insurance, surrender his original government insurance policy and accept the converted policy was done without just cause or right because plaintiff, from November 1, 1919, was suffering from pulmonary tuberculosis

and his physicial condition was such that he should have been rated totally and permanently disabled and should not have been required to have made any premium payments on his original government insurance referred to herein, and should not have been required to have converted said insurance policy; that all of said acts of defendant regarding plaintiff's physical disability and the ratings given thereon were done through misrepresentation of a material fact which was innocently made and made through mistake and which misled the plaintiff to his damage as to his rights under his original war risk insurance certificate."

These findings are amply sustained by the evidence. As a matter of fact, the government, through its doctors, knew more| about the prospect of his recovery than he did. The doctors were honest in their belief, but they were mistaken, as has now been judicially determined, and is not here seriously questioned. The plaintiff had a right to rely upon their statements; they were skilled in medicine; he was not; they were the representatives of the government in whose army he had served; and no relation invokes or involves more implicit confidence than that of a soldier and the government he fights for.

A new policy was issued and the old surrendered. The new policy insured against the same risks, and in the same amounts, as the old; the premium was higher, and it carried reserve values and certain additional stipulations. In applying for it the plaintiff relied upon the government doctors, for he certainly would not knowingly surrender a matured claim for an executory contract for the same thing, and pay for the privilege. In issuing it, the government relied on the same doctors, for the statute quoted granted no power to issue a| converted policy in exchange for a matured claim; furthermore, a generous and grateful government would not knowingly have taken such advantage of one of its service men. In the government's brief herein, it is stated:

"Both yearly renewable term insurance and government life insurance, converted insurance, grant insurance against permanent and total disability. If it were assumed that plaintiff was permanently and totally disabled, his converted insurance could not have been issued."

The question is: Does this act, founded on a mutual mistake, now afford a bar to recovery?

▇ It is alleged that this situation presents an estoppel in pais, and an estoppel by contract. There is no active misrepresentation

by the assured; no intention to deceive; no reliance by the government, for it knew more of the truth than he did; and no substantial injury. Furthermore, the representation that he was not totally and permanently disabled, implied by his application, was induced by the representations of the government doctors. Certainly one party, whose own agents induced the misstatement, if there was one, cannot claim estoppel against the other, who relied thereon. It is the equivalent to saying that one can work an estoppel out of his own statements.

▇ Is there estoppel by contract? It is quite true that, where one has contracted in light of certain facts, ordinarily he is estopped to deny their existence. But it must be a valid contract; the estoppel lasts only as long as the contract; if the contract is set aside for fraud, mutual mistake, illegality, lack of consideration, or other reasons, the estoppel goes with the contract. Corpus Juris states the rule:

"If, in making a contract, the parties agree upon or assume the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact so long as the contract stands, in the absence of fraud, accident or mistake. There can, of course, be no estoppel as to matters not included in the contract.

"An estoppel by simple contract cannot be predicated on an invalid contract, unless it has been fully executed. However, it has been held that a party to an invalid contract, which is not illegal and unlawful may be equitably estopped to dispute the validity of the contract. An estoppel cannot be based on a contract which has been abrogated." 21 C. J. 1111.

The matter of estoppel by contract need not be further pursued, because, if the transaction giving rise to the converted policy stands, the old policy is surrendered, the obligation discharged and no liability can be predicated thereunder. If the trial court was right in setting aside the converted policy, no estoppel can, of course, be predicated on it. We come, then, to the fundamental question, of whether the converted policy discharged this obligation.

▇ The trial court, on ample evidence, having determined that a claim arose under the policy admittedly existing in 1919, that claim still exists, unless it has been discharged. Now a contract, or liability under a contract, may be discharged by performance or payment; impossibility of performance or operation of law, in some instances; or by agreement. 13 C. J. 588. Where the

contract has been breached, a settlement for the breach is treated generally under the heading of "Accord and Satisfaction." The defense here being a discharge by virtue of the new agreement, we may well look to the elements of a valid accord. They are, generally speaking, the existence of a disputed claim; an agreement undertaking to settle that claim, supported by a good consideration; and such accord may be set aside, like other contracts, for fraud, accident or mistake. 1 C. J. 527, 528, 570. The defendant apparently not questioning these fundamental propositions of contract law, relies strongly upon this distinction (quoting from the government's brief) :

"A mistake of a past or present fact may warrant a rescission of a contract, but a mistake in opinion or belief relative to the future duration or effect of a personal injury, or a mistake in prophecy or opinion as to uncertain future event, is not a mistake of fact, and is no ground for the avoidance of a release or of a contract of settlement. Chicago & N. W. Ry. Co. v. Wilcox (C. C. A.) 116 F. 913."

The case cited is one of a large number which hold that persons may settle for anticipated disability from personal injuries, and the settlement cannot be set aside because the actual disability was greater than anticipated. There are other cases holding that a marine policy may insure vessels "lost or not lost." These cases have no application here, for in them the minds of the parties met upon the precise question of a settlement for future disability, and the release specifically covered all disability, future as well as present. In the case at bar, the minds of the parties did not meet on the settlement of this matured claim. They did not consider the claim as matured. No mention of settlement of any claim appears in the application or policy, and neither party intended to settle any claim. Moreover, it may be observed that ordinarily an injured person may await the event of his disability before settling; in this case the plaintiff must do one thing or the other by July 2d; he could not wait without losing his insurance.

The truth about the matter is that, if either party had believed a matured claim existed, instead of an executory term policy of insurance, the new policy would have been neither applied for nor issued. The parties contracted on the assumption of an executory term policy being still in force, when as a matter of fact it had matured. The case is very similar to a fire insurance policy being issued on a building, which, unknown to ei-

ther party, had already been destroyed. There is nothing to which the risk could attach. So, in the case at bar, the government issued a policy agreeing to pay in case of future disability, when the disability existed when the policy issued. Williston, in his work on Contracts, devotes a part of a chapter to Mistakes as to the Subject-Matter of Contract; and at section 1568 states that, if an insurance premium is paid on the assumption that a risk attaches, and none does by reason of mutual mistake, there is no contract. See, also, section 1559. In 26 C. J. p. 40, § 26, the rule is stated :

"It is an elementary principle of law that the property insured must be in existence at the time when the risk attaches, and if at that time, although without the knowledge of either party, the property is not in existence, there is no valid insurance."

The general rule as to mutual mistake is stated in 13 C. J. 275 and 276, is supported by an imposing array of authorities, and is as follows:

"Mutual mistake as to material facts will avoid the agreement. Where certain facts assumed by both parties are the basis of a contract, and it subsequently appears that such facts did not exist, there is no agreement. Thus, where parties agree in regard to a thing which, unknown to both parties, does not exist at the time, there is no contract, for there is no subject-matter. So also where parties contract under a mutual belief that a right exists which in fact does not exist, there is no agreement."

The principles of law enunciated by the Supreme Court in Allen v. Hammond, 11 Pet. 63, 9 L. Ed. 633, govern this case. In that case the plaintiff agreed to pay the defendant 10 per cent. of the value of a ship and cargo for his services in securing its release from the Portugèse government. Unknown to either, the Portugese government had conceded plaintiff's right eight days before the contract was signed. In a long and able opinion, the court said that the contract should be canceled; it contemplated the necessity for long and arduous services, a necessity that did not in fact exist. There was no fraud claimed. The court said, in part:

"That the contract was entered into by both parties, under a mistake, is unquestionable. Neither of them knew that the Portugese government had allowed the claim. Can a court of equity enforce such a contract? Can it refuse to cancel it? That the agreement was without consideration is clear. Services long and arduous were contemplated as probable, by both parties, at the time

the contract was executed. But the object of pursuit was already attained. * · * *

"No case, perhaps, has occurred, or can be supposed, where the principle on which courts of equity give relief is more strongly presented than in this case. The contract was entered into through the mistake of both parties; it imposes great hardship and injustice on the appellee, and it is without consideration. These grounds, either of which, in ordinary cases, is held sufficient for relief in equity, unite in favor of the appellee. Suppose a life estate in land be sold, and at the time of the sale, the estate has terminated by the death of the person in whom the right vested; would not a court of equity relieve the purchaser? If the vendor knew of the death, relief would be given on the ground of fraud; if he did not know it, on the ground of mistake. In either case, would it not be gross injustice, to enforce the payment of the consideration? If a horse be sold which is dead, though believed to be living by both parties, can the purchaser be compelled to pay the consideration? These are cases in which the parties enter into the contract, under a material mistake as to the subject-matter of it. In the first case the vendor intended to sell, and the vendee to purchase a subsisting title, but which in fact, did not exist; and in the second, a horse was believed to be living, but which was in fact dead. If, in either of these cases, the payment of the purchase money should be required, it would be a payment without the shadow of consideration; and no court of equity is believed ever to have sanctioned such a principle. And so in the case under consideration; if Hammond should be held liable to pay the demand of the appellant, it would be without consideration."

This case has been repeatedly followed in both state and federal courts. Rose's Notes, vol. 3, p. 193. See, also, to the effect that contracts may be rescinded or reformed by reason of a mutual mistake as to a material fact, Hearne v. New England Mut. Marine Insurance Co., 20 Wall. 488, 490, 22 L. Ed. 395, and Moffett Co. v. Rochester, 178 U. S. 383, 20 S. Ct. 957, 44 L. Ed. 1108.

The government in its brief concedes that the converted policy discharges the liability only "in the absence of fraud, duress, and undue influence." But mutual mistake is quite as well recognized a head of equitable relief and is generally included in the quoted phrase.

Shortly after the right to convert term policies arose, several questions were propounded Attorney General Palmer, and in an opinion to the Director of the Bureau he laid down several principles of law, which are applicable to this case, and which appear to us to be sound. In that opinion he held (32 Op. Attys. Gen. 379):

(a) Where a claim under a term policy has matured by total disability, there is "no insurance left which is subject to conversion."

(b) Where a claim is pending under a term policy, the Bureau should hold up application for conversion until it is determined whether there is a permanent total disability.

(c) If it issues a converted policy, the conversion is effective "provided at the time of conversion the claimant was not totally and permanently disabled."

(d) If the Bureau converts in absence of knowledge of total disability, the conversion will not be binding.

(e) That when total disability occurs, the contract ceases to be insurance.

(f) The Bureau "is not authorized by law to grant forms of converted insurance when term insurance has matured."

The question of consideration for the new contract has been suggested, and was relied on by the court in Larsen v. U. S. (D. C.) 29 F.(2d) 847. It is urged that by the new policy the government only agreed to do that which it was already bound to do. The new policy contained certain incidental provisions as to reserve values, and incontestability, and the like, and the question is not free from doubt. It is not necessary to pass upon it, since it seems clear to us, for the various reasons assigned, that the act of conversion, under the circumstances of this case, is not a discharge of the obligation of the government which matured in November, 1919.

The government cites Stevens v. U. S. (C. C. A.) 29 F.(2d) 904, as contrary to this conclusion. It is not. That case was one of reinstatement, and not conversion, and the statute permitting reinstatement specifically requires that the applicant for reinstatement prove that he "is not totally and permanently disabled." 38 USCA § 515. Moreover, in that case, the applicant made an affirmative false statement as to his condition. But, beyond all that, there was no claim of mistake, and the court qualified its holding by the phrase "in the absence of fraud, accident, or mistake." On the other hand, two District Court cases have held in accordance with this opinion. Larsen v. U. S., 29 F.(2d) 847; Andrews v. U. S., 28 F.(2d) 904.

The government further asserts that, even if this all be true, the plaintiff cannot recover without making the Director of the Veterans' Bureau a party to the action, and then

clinches the defense by stating, in its motion to dismiss, that "the Director of the United States Veterans' Bureau is not now nor can he be made by [un]lawful services of process a party to this suit." That is to say, the government by merely asserting a defense of a new policy, can thereby maintain it, and oust the court of jurisdiction to pass on this contested claim. For if the Director is a necessary party, and he cannot be made a party, then the mere assertion of the defense ends the case. We are cited to U. S. v. Meadows, 32 F. (2d) 440 (8 C. C. A.). That case but follows Silberschein v. U. S., supra, in holding the courts without power, in the ordinary case, to compel a reinstatement of a lapsed policy. But the statute gives the courts express power to decide claims on insurance policies. The relief sought here is the payment of a claim on a policy; the government objects to paying it because of the issuance of a new policy. All the court is called upon to do is to adjudicate that defense, and incidentally thereto, as a protection to the government, to cancel the new policy. The United States, and not the Director, is a party to both the contracts; the United States is the principal, the Director the agent; when the principal is rightfully in court, there is no need of bringing in the agent. Besides, in actions where an agent of the government is a party, the courts look through the nominal party and treat the case as one in fact against the government. State Highway Commission of Wyoming v. Utah Const. Co., 278 U. S. 194, 49 S. Ct. 104, 73 L. Ed. 262. Schroeder v. Davis; 32 F.(2d) 455 (8 C. C. A.); Kansas v. United States, 204 U. S. 331, 27 S. Ct. 388, 51 L. Ed. 510. The real party in interest here is the government; it has given permission to be sued in its own name in this class of cases; the courts have ample power to decide such claims and defenses thereto, without being required to make the agent of the government a party to the suit, along with his principal.

■ The government further asserts that plaintiff's claim is barred by laches; that, if he was totally and permanently disabled in 1919, he should not have waited seven years to bring his suit. But plaintiff could not have sued between 1922 and 1925, for the government was then paying him; he could not sue thereafter until he believed his disability was permanent. He is not guilty of laches, because he relied on the doctor's opinion that he would get well. The following quotation from the government's brief illustrates its position:

"Plaintiff, like every other rational man, has personal direct knowledge of the fact he was suffering from tuberculosis, and of his own physical condition. This knowledge was obviously much more extensive and accurate than could be secured by any one else."

This is not true in fact. People do not know more about their physical condition, and the probable duration of their diseases, than their doctors. That is what doctors are for—to ascertain what is wrong and cure it.

■ The government further contends that the plaintiff should have brought two actions instead of one. We quote:

"It would be necessary for the plaintiff to bring an action demanding the cancellation of the converted policy and then an action upon the original insurance contract against the Director of the Bureau. That action, however, is not proper against the government of the United States."

In the fifth assignment of error, the government says that the first of these suits cannot be maintained, because of lack of jurisdiction. In other words, there is no remedy for the holder of such a policy if the government interposes the defense of discharge or estoppel by a new contract. The statute conferring jurisdiction upon the courts to determine controversies arising out of claims under these policies is to the contrary, and sufficiently answers this contention.

■ It is further contended that the "converted" policy is still in the physical custody of the plaintiff. It not being a negotiable instrument, and the rights of both parties thereto being now adjudicated, the possession of the paper would not seem to be of consequence. Moreover, the amended complaint tenders the possession of the paper to defendant. The decree cancels it as a contract. If further protection against this canceled instrument is desired, doubtless the trial court, on application of defendant, will direct that its possession be delivered to counsel for the government.

Under the facts as shown by this record, and as found, the plaintiff must recover under the old policy or not at all. If the new policy has not lapsed for nonpayment of premiums, any action under it would be met by the proposition that the disability did not occur while it was in force, and that, under the ruling of the Attorney General, it should not have been issued. A policy of insurance was issued and paid for; the risk insured against occurred while it was in force, and the plaintiff is entitled to his money. The objections urged go to form, and not to substance, and are not sound. The trial court did no more than put the parties in the position they would have been in if they had not

been mistaken as to the facts; it rectified a mutual mistake in accord with settled rules of equity and does substantial justice to the parties.

In addition to allowing a recovery on the insurance claim, the court allowed a recovery of $719.16 for premiums paid since the policy matured. This was doubtless done on the theory that even voluntary payments, made under mutual mistake of fact, are recoverable. U. S. v. Carr, 132 U. S. 644, 10 S. Ct. 182, 33 L. Ed. 483. The United States cannot be sued without its consent, and then only in the tribunal consented to. No jurisdiction has been conferred upon the district courts to allow such a recovery under section 19 of the World War Veterans' Act, or any other statute. The judgment is in error as to this sum.

If, within 30 days from the date of the filing of this opinion, appellee files a remittitur of such sum of $719.16 in the office of the clerk of the trial court, and within 10 days thereafter files a certificate of such remittitur with the clerk of this court, the judgment of the court below will be affirmed; otherwise, reversed for proceedings in harmony with this opinion.