## GREEN v. UNITED STATES.
### No. 9237.

Circuit Court of Appeals, Eighth Circuit.
March 22, 1932.

10

STONE, Circuit Judge, dissenting.

Charles L. Graham, of Carrollton, Mo., for appellant.

A. B. Lovan, Asst. U. S. Atty., and Vergil E. Willis, Ins. Atty., Veterans' Administration, both of Kansas City, Mo. (William L. Vandeventer, U. S. Atty., of Kansas City, Mo., and William Wolff Smith, Sp. Counsel, Veterans' Administration, and C. L. Dawson, Atty., Veterans' Administration, both of Washington, D. C., on the brief), for the United States.

Before STONE and BOOTH, Circuit Judges, and WYMAN, District Judge.

BOOTH, Circuit Judge.

This is an appeal from a judgment in favor of defendant in a war risk insurance case. The action was brought by the administrator de bonis non. A jury was duly waived, and the case was tried to the court. At the close of plaintiff's case, the defendant demurred to the plaintiff's evidence and moved for judgment in favor of defendant. The court granted the motion.

Among the main facts admitted by the pleadings or on the trial were the following: The deceased, Arthur W. Green, enlisted April 29, 1918; was discharged June 11, 1919. His war risk insurance policy lapsed July 31, 1919. He became totally blind in 1926. The action was first brought by Arthur W. Green. After his death it was revived by his representative. Disagreement as to the right of recovery was also duly admitted.

The sole question in the case, as admitted by counsel and as stated by the court, was whether Arthur W. Green was totally and permanently disabled on and prior to July 31, 1919.

There was evidence to the following effect: Prior to his enlistment, Green was a young farm boy 22 or 23 years of age. He did general farm work and was a good hand. Witnesses testified that before Green entered the army, he was "an extra good hand." He was robust and stout and not a drinking man.

The experiences he passed through while in the service are shown on his discharge papers as follows: " * * * battle engagements, skirmishes, expeditions; Lucey Sector, August 6 to September 11, 1918; St. Mihiel offensive, September 12 to 16, 1918; Euvezin Sector, September 17 to October 7, 1918; Meuse-Argonne offensive, October 19 to November 11, 1918; raid, Bois de Donmartin, September 23, 1918 * * *."

The unusual severity of the service cannot be questioned. The discharge papers also show: " 'Wounds received in service, none. Physical condition when discharged, good.' And the signature of the soldier, 'Arthur W. Green,' over the signature of 'W. H. Schwind, Captain, Infantry, U. S. Army, Company B, 356 Infantry' * * *."

At the time of his discharge, June 11, 1919, he was met at the troop train by his brother, who testified at the trial as follows:

"When I first saw him was in the troop train in Kansas City before he was discharged. * * * I found him in the car in the seat, sitting in a seat in the car, so he seemed to be feeling bad of some kind, and his head was hurting him or something, and I asked him how he felt and he said he hadn't been able to eat anything, but I noticed him—it seemed to me that there was something wrong with him. He didn't look like the same fellow to me, looked like he was all blowed up and had a kind of a starey look from his eyes. * * *

"Arthur always complained of being sick, that there was something wrong with his head. He would get dizzy spells and sick spells, and he had these sick spells and dizzy spells a day or two after he was discharged, and he continued to get worse every day. He had a wild, starey look and had no control of himself and would fall over, and he would fall on anything that was in the road. * * *

"Arthur was discharged June 11, 1919.

In my mind Arthur was never able to do a day's work since his discharge. He tried to work, he had the reputation of being one of the best farm hands. He held lots of jobs; he would hold a job at anything there was no work about. He could sit on a cultivator if he didn't fall off and fall under the wheels, and things like that, and he tried up to the time he couldn't move. * * *

"I think the first man he worked for was Mr. Wilhelm, on a farm near town. * * *

"Arthur was always looking for a job after his discharge, but he couldn't hold a job very long, it seemed like."

Mr. Wilhelm, for whom Green worked in June, 1919, testified as follows:

"Well, when I went to him, to hire the man, I asked him * * * if he would shock wheat for me, and he said he would, but he said that he couldn't make me a full hand. He didn't state why, nor I don't think that I asked him, and I said, 'Well, what will we do about the wages?' 'Well,' he says, 'you pay me what you think I am worth.' I said that was fair enough, so when we settled I paid him $5 a day, and to my knowledge he worked eight days for me. * * *

"I think the majority of men were getting $6.00. * * *

"I didn't think he done the work that an ordinary man would."

Other witnesses who saw Green at the time of his discharge testified that he had a "starey look" in his eyes; that he did not look natural or speak natural; that his appearance indicated that he could not "see good"; that "he had a kind of a stare—look at you and wouldn't answer your questions readily"; that he "didn't talk straight out like he used to."

One witness for whom Green worked shortly after his discharge testified that Green got dizzy and had nosebleed while working; that while working, a few months later, he would stagger forward and would have sinking spells; that he claimed he was sick and could not eat, and did not eat very much; that he seemed to have a discouraged attitude toward life.

Witnesses testified that practically this same condition continued from the time of his discharge. At times he was able to work, but he was not considered a good hand; and kept the jobs which he obtained only a short time. His sight grew worse; and he finally became totally blind.

One of the witnesses who employed him for several months evidently did so out of sympathy. He testified: "I testified on cross-examination that I paid Arthur Green $50. The reason I paid that sum was through sympathy. He had worked for me ever since he was a boy about thirteen years old, off and on, and was working for me before the time he went to the army, and when he came back I felt it was my duty to keep him."

Two doctors testified, and excerpts from their testimony are as follows:

Dr. A. G. B. Brown, a witness for the plaintiff, testified as follows:

"I had occasion to examine Arthur Green after he came out of the army, but cannot give the date. * * *

"The Court: In any event, it was within a year? A. Oh, yes, it was less than a year.

"Q. (by Mr. Graham) You would say within a month, would you? A. I would naturally think it was a month. I know I saw him almost every week, so far as that is concerned, but his physical condition, I am satisfied it wasn't over a month when I had occasion to see him. When I first examined him I just considered it a nervous condition, due to some excitement or some such cause. I first noticed him losing his eyesight, I think, several years afterwards. His nervousness just seemed to gradually grow worse. He would gradually become more of a complainant all the time, and it was a hidden case that I couldn't make a diagnosis to tell what the real trouble was. I think he became totally blind four years after he left the army.

"Q. Doctor, in your opinion as a doctor, what would you say Arthur's trouble was attributed to? A. Well, I could lay no other cause only shell shock. Of course, that covers a multitude of conditions, but it was the only cause I could find.

"Q. In your opinion, you say Arthur Green was a well man when he was discharged from the army—a well man or unwell man? A. He was an unwell man when he was discharged from the army.

"Q. And would you say he was not capable of carrying on a gainful occupation? A. He absolutely wasn't after he left the army."

On redirect examination he testified: "He complained to me of dizzy spells from the very beginning of his trouble. I considered it a condition I didn't exactly understand. I really didn't understand the dizziness, but I knew it was a deep condition. I sent him to the Veterans Hospital about his blindness."

On recross-examination he testified: "I never treated him for blindness, and think his nervousness was due to shell shock and that

is the only explanation that I can make for it. I never saw one in his condition. His condition was different from any I had ever seen, and I assumed it was from shell shock."

Dr. R. M. Benson, a witness for the plaintiff, testified as follows:

"I examined Arthur Green, the exact date of the examination that I made on him I wouldn't remember; some time, probably, in 1921 or 1922. * * *

"I found especially a condition of his eyes that meant some serious trouble in store for him, and I asked him at the time if he had reported this to the army, if they knew anything about it, and he said he had not. But at the time I examined Green, I wouldn't be sure when it was—I found him suffering with an optic atrophy. An optic atrophy, as a rule, is preceded by a choked disk and optic neuritis which usually runs for eighteen months or two years before this atrophy takes place, and as I said, or rather I told Green, I said, 'You should report this to some of the officials because you have a condition that is absolutely incurable and there isn't any question in my mind but what that dates back to your army service and it is due to some of the trouble you have gone through over there in France,' and I told him at the time I would give him some counteractive treatment and he could come back if he wished, but that the treatment in all probability wouldn't do him much good, and later on he came back with a history of having had some convulsions and terrible headaches and a condition that would lead any thinking man to assume that he had a cerebral edema or toxicity that had developed in the blood stream that was causing him some serious trouble and it was manifesting itself not only on the cerebral tissue but on the optic nerve, producing this atrophic condition itself. * * *

"Q. From your examination, Doctor, what would you attribute that trouble to? A. Well, I attributed that trouble to shell shock or a toxicity, a cerebral edema; whether it was shell shock, I don't know, but something happened to him that either caused him to absorb toxins from the blood stream to cause cerebral edema or to cause him to have some trouble with the cerebral tissue itself. * * *

"Q. You say you first examined him in 1920? A. Well, I don't remember about that exactly, 1921 or 1922. I don't remember exactly. I couldn't find any record. * * *

"Q. When you first examined him, how long back would you say this trouble had been existing? A. Well, at the time I saw him he had a decided optic atrophy, and he may not have had it but in all probability he first had a choked disk and then that was followed by an optic neuritis—it probably existed eighteen months before he developed the atrophy. Now, it is possible it might have been otherwise, but probably that is the way it was.

"Q. Eighteen months or two years probably?

"The Court: As I understand you, you said your examination was either in 1921 or 1922? A. Well, I don't know just when it was. I wouldn't know about that.

"I knew Arthur Green before he went to the army. His physical condition at that time was not impaired, he was all right. Before he went into the army he was a man capable of carrying on a gainful occupation. After he was discharged and came to my office he was in no condition at all to work, doing any kind of manual labor. He wouldn't have been capable of earning a living."

On cross-examination he testified:

"At the time I saw him he had optic atrophy; that is a sloughing away of some of the nerves, degeneration of the eye, and later results in blindness. It is possible that the trouble might result from any toxic condition or any inflammation.

"Q. So that when you said you thought it might possibly be shell shock, you are first taking his condition as you saw him in probably 1922? A. Yes, sir.

"Q. Or whenever it was? A. Yes, sir.

"Q. And then you are assuming from that that the condition existed a certain time back? A. That is right.

"Q. And then you are assuming that it might have been caused by shell shock at that time? A. That is right.

"Q. And your conclusion is based upon those assumptions only? A. That is right."

This is not a case of weighing conflicting testimony, or of considering testimony of doubtful value. The trial court, speaking of the witnesses, said: "They impressed me, every one of them without exception—that includes the relatives of this insured—as honest, truth-telling, fair witnesses, honorable men and women. I accept as true everything that has been said by every one of them; that is to say, every statement of fact which has been testified to by every one of them."

The question before us, therefore, is: Does the evidence make out a prima facie case of total permanent disability on July 31, 1919, the date of the lapse of the policy?

The trial court, in rendering judgment

for defendant at the close of plaintiff's case, said: "Has there been any testimony that this insured was shell shocked in France? There has been some suggestion that shell shock might have been the cause of the condition that he later had, but not a word of testimony in support of the allegation in the plaintiff's petition that he was shell shocked in France, or otherwise injured in France or in the army."

We think the trial court assumed that it was a necessary element of the plaintiff's cause of action that the disability of the insured was of service origin; and further assumed that unless this was shown by the evidence, the plaintiff could not recover. In this we think the court erred.

The real issue in the case was as to the existence of a permanent total disability prior to July 31, 1919. The cause of such disability is not of vital importance. It is the disability within the insurance period and not the cause of it which gives rise to the cause of action. The cause of action is one in contract and the contract does not require proof of the cause of the disability.

In United States v. Golden (C. C. A.) 34 F.(2d) 367, the Court said at page 369:

"The whole case is clouded by a mistake plaintiff labors under, a confusion of war risk insurance and compensation. It appears at length in his amended complaint, in the testimony, and apparently in the findings of the trial court. In his amended complaint, instead of simply alleging a permanent and total disability while the policy sued on was in force, the plaintiff set out in detail the various 'ratings' of the government for purposes of compensation. Counsel for the government promptly detected the error, and moved to strike all the allegations as to 'ratings' for compensation, and in support thereof said:

" 'That the first grammatical paragraph 6 of said amended complaint should be stricken because the said war risk insurance matures either upon the permanent total disability or death of the insured while the said insurance is in force and effect and it is immaterial whether the disability or death is due to the military service of the insured or whether any rating was ever given the said insured and therefore the said allegations in the said paragraph are immaterial and irrelevant, and do not constitute a cause of action against this defendant.'

"The government is quite right in this contention. * * * Compensation flows from service, like pensions of old, and the soldier is not consulted in the matter. Insurance is a contract, and the soldier takes it or leaves it alone; if he takes it, he pays for it, and his benefit is proportional to his payment. White v. U. S., 270 U. S. 180, 46 S. Ct. 274, 70 L. Ed. 530. Compensation benefits are paid to veterans to compensate them for a loss of ability to follow their pre-war occupation. It is only payable when the incapacity is traceable to a service origin and in line of duty. * * *

"On the other hand, insurance benefits go only to those who have bought and paid for policies of insurance. The amount paid depends on the amount of insurance bought. * * * An insured must be totally and permanently disabled, or he recovers nothing; 90 per cent. disability avails him not. Nor does his disability depend upon his ability to follow his pre-war occupation; he must be disabled from following 'any substantially gainful occupation.' Service origin is immaterial in insurance. If he is totally and permanently disabled while his insurance is in force, he recovers, regardless of its origin. A total disability directly traceable to service origin will not entitle him to recover, unless it occurred while his insurance was in force."

In United States v. Tyrakowski (C. C. A.) 50 F.(2d) 766, a case somewhat similar to the case at bar, the court in its opinion said, at page 768: "In order for appellee to recover, it was not necessary for him to prove that such disability occurred while he was serving in the war, nor that it was occasioned by such services. It is sufficient if it occurred from any cause prior to lapse of his policy at midnight on August 31, 1919. On the other hand, the policy does not cover any total permanent disability which began after August 31, 1919, even though it was caused by his service in the war." And again the court said, at page 770 of 50 F.(2d) : "He does not attempt to classify his disease by name, and it is not necessary for him to do so. Neither is it necessary for him to trace its cause. He says that he thinks it was caused by the kick, of course, and the evidence hardly supports this statement; but, regardless of this contradiction, his testimony shows that he was suffering from something at the time of his discharge, regardless of its name or cause, and there is evidence tending to show that the disability was total and permanent. * * * "

See, also, Jackson v. United States (D. C.) 24 F.(2d) 981, 983; Jagodnigg v. United States (D. C.) 295 F. 916.

What constitutes total and permanent dis-

ability has been settled by repeated decisions of this court, and we do not understand that there was any dispute in the trial court on this point.

In McNally v. United States, 52 F.(2d) 440 (C. C. A. 8), the cases are reviewed and the court said, at page 441: "If the disabled person cannot follow continuously a substantially gainful occupation, he is totally disabled, even though he does some work."

For an exhaustive discussion of the terms used in the definition, see United States v. Perry, 55 F.(2d) 819 (C. C. A. 8); United States v. McGill, 56 F.(2d) 522 (C. C. A. 8).

Regulation No. 11 of the Treasury Department, Bureau of War Risk Insurance, issued March 9, 1918, defines "permanent disability" as follows: " 'Total disability' shall be deemed to be 'permanent' whenever it is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

The courts have adopted this definition. United States v. Worley, 42 F.(2d) 197, 199 (C. C. A. 8); United States v. Meserve (C. C. A.) 44 F.(2d) 549; Carter v. United States (C. C. A.) 49 F.(2d) 221, 223.

In cases of the character of the one at bar, testimony of doctors who examined the insured is of special importance. It is not necessary that the examination should have been made during the time when the insurance was in force. It is of weighty importance if from a subsequent examination the conclusion was fairly reached that the condition of the insured was such that it could be reasonably inferred that at a time within the insurance period, the insured was totally disabled; and, further, that it could be reasonably inferred that the disability within the insurance period was such that it would be permanent. See McNally v. United States, supra.

In the case at bar, we do not need to go that far. The direct evidence, we think, would fairly support a finding that there was a total disability at the time of discharge within the proper definition of that term. The evidence conclusively shows that the same disability continued until the death of the insured. The permanence was thus not only proved by the lapse of time, but the opinion of Dr. Brown, who examined him shortly after the discharge, was that a permanent disability existed at the time of discharge. He testified:

"Q. In your opinion, you say Arthur Green was a well man when he was discharged from the army—a well man or unwell man? A. He was an unwell man when he was discharged from the army.

"Q. And would you say he was not capable of carrying on a gainful occupation? A. He absolutely wasn't after he left the army."

This was the opinion of a doctor who examined him about a month after his discharge.

The policy did not lapse until 50 days after his discharge.

The opinion of Dr. Benson was that the condition which he found in 1921 or 1922 dated back to a time prior to the discharge, and that the condition was incurable, i. e., permanent. He testified: " * * * I found him suffering with an optic atrophy. An optic atrophy, as a rule, is preceded by a choked disk and optic neuritis which usually runs for eighteen months or two years before this atrophy takes place, and as I said, or rather I told Green, I said, 'You should report this to some of the officials because you have a condition that is absolutely incurable and there isn't any question in my mind but what that dates back to your army service and it is due to some of the trouble you have gone through over there in France * * *."

This was the opinion of a doctor as to the disability, the permanency of it, and the commencement of it—all based upon an examination two years subsequent to the discharge.

The only speculation in the testimony of the doctors was whether the condition was caused by shell shock; but this was, as we have shown, immaterial.

We think the fair purport of the testimony, both lay and medical, is that prior to the lapsing of the policy the insured was "totally and permanently disabled" within the established meaning of that phrase; but that the cause of the condition was uncertain.

We think the evidence on behalf of plaintiff made a prima facie case, and that the court erred in entering judgment for defendant.

The judgment is reversed, and the case is remanded for a new trial.

STONE, Circuit Judge, dissents.