### ASHER et al. v. UNITED STATES.
### No. 9513.

Circuit Court of Appeals, Eighth Circuit.
Jan. 19, 1933.

R. W. Wilson, of Pine Bluff, Ark., and W. F. Norrell, of Monticello, Ark., for appellant.

Wallace Townsend, U. S. Atty., J. A. Tellier, Sp. Asst. to U. S. Atty., and Edward S. Ragsdale, Insurance Atty., Veterans' Administration, all of Little Rock, Ark., for the United States.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

GARDNER, Circuit Judge.

This appeal is from a judgment entered upon a directed verdict, in an action brought by appellant on a contract of war risk insurance. The action of the lower court in directing a verdict in favor of the government is the only error assigned.

The insured, Charles G. H. Asher, referred to in the record as Gilbert Asher, entered the military service June 25, 1918, was overseas from August 20, 1918, to July 5, 1919, and was honorably discharged July 25, 1919.

The action was brought by G. H. Asher, as guardian of the insured.

The policy lapsed August 31, 1919. The disability, alleged to have been total and permanent before the lapse of the policy, goes solely to the mental condition of the insured.

When insured entered the military service, he was about twenty-one years of age. His life had been spent on the farm of his father, near Collins, Ark., where he had helped with the farmwork. His discharge from the army gives his physical condition as "good." Upon his return from the service, he was met at the train by his brother, Julius, and other friends and acquaintances. When he alighted from the train he did not walk up to the depot as the other passengers did, but stood staring about, picking his finger nails, until friends went to him. He shook hands with them and showed them a watch he had. Going down town he met several friends whom he had known before entering the army, but he would not speak to them unless they first spoke to him. He seemed indifferent to others, and was mostly silent. He was driven home, where he met his mother. She attempted to embrace him, but he avoided her, at first looking away from her, but finally permitting her to embrace him.

From the time of his return, he habitually picked at his fingers and finger nails, was moody, had a staring and glassy look out of his eyes; he usually looked off and was indifferent to those who tried to talk to him, and had an embarrassed appearance. He would not stick to any subject of conversation, and at meals would eat only what was near him rather than ask for anything.

L. A. Ogles, a neighbor living within a quarter of a mile of the Asher home, who had gone to school with insured, testified that the day after his return the witness went to the Asher home to see him. Gilbert was at the barn, walking around it, and as the witness put it, "He would peep in and look this way and peep that way, and I got in 10 or 15 feet of him and I said, 'Gilbert, what are you doing?' and he turned around and gave me a silly grin, between a frown and a grin together, and walked on without saying anything. * * * I don't think he ever spoke to me that day. I had known Gilbert ever since he was a little boy going to school—went to school with him and we were good friends."

The witness testified that on one occasion, on returning to his home one evening, he found insured hunched up on the hay in the hay barn, and, on being asked by the witness what he was doing there, he got up and walked off. Another incident related by the witness was when insured came to his home about seven or eight o'clock in the evening, called for the witness, and wanted him to go to the Oatsvall home, saying that he was going up there and plead for them and save them. "Said they were a rotten bunch and there had to be something done or they would die and go to hell, and I refused to go and he said I would have to go, he was King of France and I would have to do what he said." This incident was within one or two months after the return of insured from the army. Referring to another incident, the witness said: "He was up at Collins at the Baptist Church. When they got through preaching he said he was going to preach and I kept him away until church broke and part of the people were coming out, and he shook hands with several of them."

The witness also testified: "I was living right there by him and swapped work with his father, and sometimes he would work a few minutes and sometimes they couldn't get him to do anything. Sometimes he would— as for seeing him work I don't remember seeing him work but very little. I remember one time I went down there to get him to work for me and he wouldn't do it, and I have seen him make an effort to plow. How good work he done I don't know anything about it, but I saw him let some mules go across the field and he threw the plow handle down and let the mule go; wasn't making any effort to stop it."

Another witness testified that he knew the insured well before he went into the army; that he knew there was something wrong with him when he first spoke to him when he came out of the army, which was about three weeks after his return.

Robert Fowler, who had known insured for many years and saw him a few minutes after he got off the train at Collins on returning from the army, testified that in the summer of 1919 he saw insured near the Baptist Church at Collins. He came up in front of the church where a crowd of young people were gathered, and they all spoke to him, but he did not speak. The witness said: "Someone made a remark about a bird in a large oak tree standing in front of the building, and he told them he could have the birds come down and tame squirrels, he had power to do that. And some of the girls asked him, 'You haven't got that much power,' and he said, 'I have power to do anything God can do.' "

There was testimony of his thrashing the live stock on the farm at times until he became so tired and hot he had to desist; of the manifestation of a desire at times to boss every one, claiming that he was president of France or Woodrow Wilson, and that he had the power of Samson or God.

J. C. Weatherall, a near neighbor of the Asher family in 1919 to 1921, saw the insured about three weeks after his return from the army, and, although he was well acquainted with him, the insured did not wish to speak to him. A little later he observed him, and in his testimony says: "At that time he wouldn't talk to you, would sit around and fool with his fingers and clean his finger nails, and if he wasn't cleaning them he would sit around with his head dropped, and sometimes he would look up and then would look right off; wouldn't look at you long at a time. * * * As to his actions and movements and talk during the year 1920, I recall one time I was going down across the farm and met a mule pulling a plow and I knew Gilbert was plowing it that morning, and I stopped the mule and turned him around and started back down through the field with him and got down to where he was plowing and he was lying down asleep. He would work when his father or brother was around with him to show him how to work or tell him to work. When they left him he would turn his team loose and go to sleep or go to fooling with his hands and drop his head. Didn't pretend to do anything. I passed through the fields a lot of times and would see him sitting on the plow beam with his team tied up and grazing around. No, sir, I never did hear him do any talking or attempt to do any talking, no more than I saw him at Collins sometimes afterwards, and the boys would gather around him and pick at him and he would say things that were kinda funny to them and they would egg him on. One of the things he said was that he was Samson, was a powerful man, and at other times he was a preacher—I don't remember the exact words he used. In 1920 I lived about a half mile from where he lived, and in 1921 at the same place."

Dr. R. E. Kellum was in Collins, Ark., in the fall of 1919, looking for a new location. He saw insured surrounded by a crowd of boys who were picking at him and having fun with him. From his observation of insured at that time, based on the way he acted, the doctor "passed him up as being crazy."

On July 22, 1921, the insured was placed in the State Hospital for Nervous Diseases at Little Rock, where he remained about seven months, when he was transferred to the United States Hospital for the Insane at Fort Logan H. Roots, Ark., where he has ever since been confined, except for temporary periods of absence.

There was evidence that insured hunted a great deal and would get lost and have difficulty in finding his way home in a country with which he was very familiar. There was also evidence to the effect that his work was fitful and indifferent, and that he would not stay at it.

Dr. L. R. Brown, superintendent of the State Hospital for Nervous Diseases, who had made a special study of mental diseases for twenty-four years, and qualified as an alienist or psychiatrist, was the only medical witness who gave expert testimony in the case. He had no acquaintance with the insured's case, and his testimony was purely hypothetical.

He testified that in his opinion the insured was insane from July 25, 1919, to July 23, 1921, and that during that time he was not able mentally to follow continuously any substantially gainful occupation, and that this mental condition was permanent. He had heard all the testimony of the various witnesses, and this testimony was epitomized in a hypothetical question. He stated that the insured could not independently or on his own initiative follow any useful vocation. On cross-examination the witness strengthened his testimony by stating that taking into account the state of facts propounded to him by counsel for the government, in addition to those embodied in the hypothetical question, the insured was incapable of carrying on successfully a substantially gainful occupation and making a living for himself, and that the elements injected into the hypothetical question by counsel for the government would in no way change his opinion. On cross-examination, as to the effect of this mental disorder, the witness, among other things, said: "As I see it every day out there (at the hospital) there are many of our patients that work under directions, but if they were permitted, or compelled, to go out into the world depending on themselves they wouldn't get anywhere. I believe this man was a case of that kind. He was being constantly supervised by his family and he did some little work."

He further testified: "I think the absolute recovery from dementia praecox in any form is extremely rare; we have stages of the catatonic form where they appear to have recovered generally, but an examination will show that they are not fully recovered and not socially recovered so that we may permit them to go out."

It was brought out in effect by counsel for the government on cross-examination that the witness, after listening to all the testimony, was of the opinion that the insured was totally and permanently disabled as early as July, 1919.

■■ In passing on the motion for a directed verdict, it was the duty of the court to take that view of the evidence most favorable to the plaintiff, and to determine the matter from that evidence and such inferences as may reasonably be drawn therefrom. If, when so viewed, the evidence was of such a character that reasonable men might reach different conclusions, then the case should have been submitted to the jury. Farmers' Natl. Bank v. Missouri Livestock Commission Co. (C. C. A. 8) 53 F.(2d) 991; Self v. New York Life Ins. Co. (C. C. A. 8) 56 F. (2d) 364; Wharton v. Aetna Life Ins. Co. (C. C. A. 8) 48 F.(2d) 37; Illinois Power & Light Corp. v. Hurley (C. C. A. 8) 49 F.(2d) 681; United States Fidelity & Guaranty Co. v. Wilson (C. C. A. 8) 41 F.(2d) 319; Crookston Lbr. Co. v. Boutin (C. C. A. 8) 149 F. 680; Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720.

■ The opinion of Dr. Brown was based on, and entirely consistent with, the facts established by undisputed testimony. So fortified, we think it constituted substantial evidence from which the jury might reasonably have found that the insured became totally and permanently disabled during the life of his policy. At least it could not be said, in view of this substantial testimony, that all reasonable, fair-minded men must have reached the conclusion that insured's permanent and total disability during the life of the policy had not been established.

■ Total disability, as the term has been often defined by this court, is any impairment of mind or body which renders it impossible for the insured to engage continuously in any substantially gainful occupation. Total disability is defined as permanent if based upon conditions which make it reasonably certain that the disability will continue throughout life. United States v. Harth (C. C. A. 8) 61 F.(2d) 541; Proechel v. United States (C. C. A. 8) 59 F.(2d) 648; Eggen v. United States (C. C. A. 8) 58 F. (2d) 616; United States v. Fly (C. C. A. 8) 58 F.(2d) 217; Green v. United States (C. C. A. 8) 57 F.(2d) 9; United States v. McGill (C. C. A. 8) 56 F.(2d) 522; United States v. Hairston (C. C. A. 8) 55 F.(2d) 825; United States v. Perry (C. C. A. 8) 55 F.(2d) 819; McNally v. United States (C. C. A. 8) 52 F.(2d) 440; United States v. McLaughlin (C. C. A. 8) 53 F.(2d) 450; United States v. LeDuc (C. C. A. 8) 48 F. (2d) 789.

True, the record shows that insured has been able to do some work. He could do some work like the ox of the field, when guided and directed, but not as an intelligent human being. We are of the view that the evidence produced by the plaintiff was sufficient to put the government on its proof, and that it presented a jury issue.

■ The credibility of witnesses and the weight to be given to their testimony are questions for the consideration of a jury; but in the instant case, the lower court, in granting the motion for a directed verdict,

said inter alia: "* * * By substantial testimony, I mean testimony of people who know what they are talking about, and testify in such a way as to convince a court and jury they have some means of remembering the facts about which they testify. I don't think that is true in this case. I don't think the mother, father, or brother would testify falsely, intentionally, but their testimony shows that they have no recollection of it. The only man that has testified is the doctor. He simply saw the boy on the street and made no examination of him; was not even close enough to tell what his mental attitude was. The others, friendly witnesses, have testified to these circumstances which convinced them, since he was sent to the asylum, that he was insane, but they could not have recalled all the details about which they testified."

In so holding, the court passed upon the credibility of the witnesses and the weight to be given their testimony, instead of accepting their testimony, for the purpose of the motion before the court, as true. But as said by the Supreme Court in Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 233, 74 L. Ed. 720, "Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury."

See, also, Chicago & North Western Railway Co. v. Struthers (C. C. A. 8) 52 F.(2d) 88.

The judgment appealed from is therefore reversed, and the cause is remanded, with directions to grant the appellant a new trial.