## MARYLAND CASUALTY CO. v. COOK-O'BRIEN CONST. CO.*

No. 9724.

Circuit Court of Appeals, Eighth Circuit.

Feb. 27, 1934.

Spencer F. Harris, of Kansas City, Mo. (Paul G. Koontz, of Kansas City, Mo., on the brief), for appellant.

Floyd E. Jacobs, of Kansas City, Mo. (M. J. Henderson and Thomas E. Deacy, both of Kansas City, Mo., on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MARTINEAU, District Judge.

*Rehearing denied April 25, 1934.

WOODROUGH, Circuit Judge.

The Cook-O'Brien Construction Company, being engaged in the work of laying water mains in the vicinity of Flagstaff, Ariz., took out two employers' liability policies with the Maryland Casualty Company covering liability for personal injuries to employees; the total liability on account of injury to any one person being limited to $5,000 costs and interest.

While the policies were in force, and on June 23, 1925, one L. L. Crawford was injured on the work as a result of a premature explosion of blasting dynamite, and in October, some four months after the accident, brought suit against the construction company for his injuries, praying judgment for $25,000 general damages and $175,000 special damages. The case was defended for the construction company by the casualty company, and upon a second trial Crawford recovered judgment for something over $12,000. The judgment was appealed to the Circuit Court of Appeals of the Ninth Circuit, affirmed and certiorari to the Supreme Court denied. The appellant, Maryland Casualty Company, went on the bond to effect supersedeas during the appeal; the construction company agreeing to indemnify. This suit was brought by the casualty company against the construction company upon the indemnity agreement given by the construction company as part consideration for execution of the supersedeas bond by the casualty company. The casualty company alleged that, after the affirmance of the judgment in favor of Crawford, it had been compelled to and had made full payment of the judgment, and was therefore entitled to recover on the indemnity agreement for the excess of the judgment paid over the limit of the policy.

To this cause of action there was no direct valid defense on the part of the construction company, and the trial court gave peremptory instruction that the casualty company was entitled to recover thereon, and there is no controversy presented here concerning it. The controversy here is related entirely to the set-off which was pleaded by the construction company. In its set-off the construction company alleged that, upon the happening of the accident to Crawford, the casualty company was promptly notified and became bound as provided in the policies to "indemnify the Construction Company against loss by reason of the liability imposed upon it by law for damages on account of such injuries," and "to serve the Construction Company by investigation and by settlement of

any resulting claim in accordance with law," and "to defend any suits which may at any time be instituted * * * although such are wholly groundless, false or fraudulent," and "to pay all costs taxed against the Construction Company in any legal proceeding defended by the Casualty Company, all interest accrued after entry of judgment, and all expenses incurred by the Casualty Company for investigations, negotiations for settlement, or defense of claims or suits," and "to pay the cost of such immediate surgical relief as is imperative at the time of the accident," and "the Casualty Company was not responsible for any settlement made or expenses incurred by the assured unless such settlement or expenditures were first specifically authorized in writing by the Company, except that the assured may provide at the time of the accident at the expense of the Company, such surgical relief as is imperative."

The construction company further alleged that, immediately after the injuries to said Crawford, the casualty company, its agents, servants and employees, took charge of the Crawford claim and the investigation thereof and subsequently the defense of the suit predicated thereon. That its agents, servants and employees ascertained before any suit was filed by Crawford that Crawford was seriously injured and that such injuries were beyond dispute; that the liability to Crawford on the part of the construction company was dangerous; that, if a settlement was not made, in all likelihood and probability a verdict in excess of the protection afforded by the policies of insurance would be secured by Crawford; that Crawford offered to, and was at all times prior to the trial of his suit and recovery of his first verdict (about $13,000) willing to, and offering to, settle his claim with the casualty company for a sum substantially less than the $5,000 policy limit; but that the casualty company, through its agents, acting in bad faith in its relations with the construction company, refused to make any offer of settlement to Crawford, and in bad faith made no attempt to effect settlement, and in bad faith made no settlement; and that it was in consequence of such bad faith on the part of the casualty company that the excess judgment obligation paid and sought to be recovered by the casualty company accrued.

The construction company also pleaded in its set-off that the casualty company, through its attorneys and agents, had been guilty of bad faith and negligence in the conduct of the defense for the construction company upon the two trials of the Crawford case, contribut-

ing to the loss. But, on the conclusion of all the evidence, the trial court announced its decision that the testimony was not sufficient to submit the claim of bad faith or negligence on the part of the casualty company in the conduct of the trials to the jury, and thereafter instructed the jury in favor of the casualty company against the construction company upon that issue.

It also instructed, as the only issue for the jury raised by the set-off, that, if the jury should find that the casualty company had declined and refused to effect a reasonable settlement of the Crawford claim or suit, having opportunity to make such reasonable settlement within the limit of the policy, and "that in so declining and refusing to effect such a settlement the Casualty Company was acting not in good faith toward the Cook-O'Brien Construction Company, but in bad faith as to the Cook-O'Brien Construction Company, a verdict against the Casualty Company on the set-off would be justified." Such verdict was returned completely offsetting the cause of action sued on by the casualty company; there was judgment thereon; and the casualty company appeals.

Error is assigned on the receipt of testimony claimed to have been incompetent; on the giving and refusal to give instructions to the jury; on sustaining the right to plead the set-off; and on the denial of motion for a directed verdict.

■ The trial court held, as reflected by rulings and instructions to the jury, that, where an insurance company agrees to indemnify against loss from personal injury claims conditioned upon the insured's surrendering control of investigations, adjustments of claims, and defense of lawsuits to the insurance company, and where the insurance company does, pursuant to such contract, take control of the investigation, adjustment of claims, and defense of lawsuits out of the policyholder's hands, assuming exclusive control, a relationship necessarily arises between the insured and the insurer which imposes on the insurer a duty owing to the insured to exercise skill and care and good faith to the end of saving the insured harmless, as contemplated by the contract to indemnify; that the discharge of the duty involves discretion and judgment and requires that the insurer make full investigation of the circumstances surrounding the accident and of the incidents of legal liability applicable where the accident occurred, and that it must act honestly to effectually indemnify and save the insured harmless as it has contracted to do—to the extent, if necessary,

that it must make whatever payment and settlement an honest judgment and discretion dictates, within the limitation of the policy. We think the weight of authority sanctions the view of the trial court, and we approve the statement of the law embodied in the court's instructions as follows:

"If you find that although there was an opportunity to make a reasonable settlement and although there was a probability, under all the facts and circumstances then known or which should have been known, that a judgment might ultimately be had against the Cook-O'Brien Construction Company in excess of the coverage (of the policy), even if you find those facts to be true, if you find that the Maryland Casualty Company did not, in bad faith toward the Cook-O'Brien Construction Company, decline or refuse to make a settlement, then in either of those events your verdict should be for the ⸱ * * * Maryland Casualty Company." "You can not find against the Maryland Casualty Company upon this issue merely because you think a mistake was made by that Company in not effecting a settlement." "You can only find against it if you find it was guilty of bad faith toward the Cook-O'Brien Construction Company." "You must understand that the Maryland Casualty Company did not agree to settle any claim." "It wasn't bound to settle any claim. It had the right to settle claims if in its discretion that was a wise and proper course, but that discretion was not one which was an absolute discretion. It could not, under all circumstances and in all cases refuse to settle a claim and go on and try the case. Its discretion was not that wide. It must exercise good faith toward the Cook-O'Brien Company in the matter of effecting settlements." American Mutual Liability Co. v. Cooper (C. C. A.) 61 F.(2d) 446; Hilker v. Western Auto Ins. Co., 204 Wis. 1, 231 N. W. 257, 235 N. W. 413; New Orleans & C. R. Co. v. Maryland Casualty Co., 114 La. 154, 38 So. 89, 6 L. R. A. (N. S.) 562; Auerbach v. Maryland Casualty Co., 236 N. Y. 247, 140 N. E. 577, 28 A. L. R. 1294; Brassil v. Maryland Casualty Co., 210 N. Y. 235, 104 N. E. 622, L. R. A. 1915A, 629.

■ Turning to the question whether there was sufficient proof of bad faith on the part of the casualty company in failing to make settlement with Crawford to justify submission of the issue to the jury. Crawford testified that he was in the employ of the construction company drilling and blasting holes in rock, assisted by one Wren Herdman, when a premature explosion of dynamite occurred, caus-

ing him very severe injuries. He believed that the premature explosion was caused by a "quick fuse" or "fast fuse," meaning a defective fuse. Mr. J. J. O'Brien was superintendent in charge of the construction company's work at Flagstaff, Ariz., and he obtained two statements from Crawford, signed, one very shortly after the accident, and the other some twelve days thereafter, and he also obtained a statement signed by Wren Herdman, the only other eyewitness. Although Crawford believed that the premature explosion came from a "quick" or "fast" fuse, in one of his statements and in that of Herdman the fuses used are described as short fuses. In his other written statement Crawford said the fuses were 16 to 20 inches long. Mr. J. J. O'Brien turned these statements over to the casualty company after they were taken, and it does not appear that the casualty company ever had any information tending to contradict this version as to how the accident occurred, or that there was ever any grounds to infer negligence on the part of Crawford causing the accident, except as presented by this version. The applicable statute of Arizona provided that an employer should be liable for injuries to workmen using dynamite in all cases in which the injury was not caused by the negligence of the employee, and there was no doubt that the facts as stated by Crawford presented a prima facie case of liability, rebuttable if he was negligent in using short fuses. In the report of accident which Mr. J. J. O'Brien, as superintendent in charge, promptly made to the casualty company, he referred to Crawford as an employee of the construction company, and indicated that Crawford was not working as an independent contractor. He said that Crawford's general duties were drilling, shooting, and mucking rock; that Crawford had been employed for about one week prior to the accident; that he had done similar work prior to this employment; and that his weekly wages were about $36.

About a week or ten days after the accident, a Mr. M. J. Halloran, the claim manager of the casualty company at Phœnix, having full charge of handling the Crawford claim as agent of the casualty company, came to the work at Flagstaff, and, after discussion with Mr. J. J. O'Brien, made his first call upon Crawford, who was then in bed but able to sit up. The evidence is that the matter of making settlement of Crawford's claim was broached by Halloran at this interview. Mr. Halloran was dead at the time of the trial, and the testimony as to what was said by him and

to him during the whole period from then until the time of the first trial of the case, a year later, in July of 1926, was brought out by the witnesses Crawford, Harrison and J. J. O'Brien. Crawford testified that there were six or eight talks between himself and Mr. Halloran concerning the settlement of the case, and he (Crawford) was willing from the first interview and up to the time of the first trial to make settlement for a sum substantially less than the $5,000 limit of the policy; that he made definite offers to Mr. Halloran to settle for the sum of $3,500; that he not only made definite offers to Mr. Halloran to settle for the sum of $3,500, which Mr. Halloran refused, but, after his employment of the attorney, Mr. Harrison, he further evinced his willingness to settle by having Mr. Harrison propose settlement to Halloran in Crawford's presence. Although Mr. Harrison asked Mr. Halloran for $5,000, Mr. Harrison insinuated at the same time that he would come down from $5,000. As Crawford's attorney, Mr. Harrison brought the suit for Crawford in October, about four months after the accident, and some months later Crawford employed the law firm of O'Sullivan &. Morgan to prosecute the action. Mr. Morgan of that firm testified that he went into the office of Mr. Morrison, attorney for the casualty company in charge of the Crawford case, on one or two occasions before the case was tried, and suggested that a settlement would be advisable, stating that his client would be willing to settle; he suggested that the client was in a mood to settle, and that the case was one where settlement would be advisable; and at the time Mr. Morgan made these advances he was informed that Crawford had personally made proposals of settlement to Mr. Halloran. Undoubtedly when the first trial of Crawford's case resulted in a verdict of about $13,000, the attitude of Crawford as to settlement was altered, but it is clear that up to that time Crawford was willing to settle within the policy limit. In that period of something over a year Mr. Halloran was the agent of the casualty company who acted for it, and it is upon his conduct that the claim of bad faith during that period is predicated against the casualty company.

As to Halloran, it appears that he was informed of the available evidence as to how the accident happened and had opportunity to observe Crawford and to know his serious condition. He knew that Crawford claimed that he was an employee when injured and that the construction company was liable to him; and he knew of the institution of Craw-

ford's suit on the claim for $25,000 general damages and $175,000 special damages for the personal injuries. He also knew that J. J. O'Brien had reported to the casualty company that at the time of the accident Crawford was in the employ of the construction company. Being the resident agent of the casualty company in Arizona, knowledge of the Arizona liability law covering employees working with dynamite was also fairly imputable to him. The record indicates that some time before the first trial of Crawford's suit Mr. J. J. O'Brien claimed that he had let the work of blasting the tunnel where the injury occurred to Crawford on a contract for a certain sum, and the books of the construction company showed charges against Crawford for materials to be used by him. Also that Crawford, after the injury, had signed a receipt for payment of money due him under such contract. It appears that a ground of defense set up in the Crawford trial was that Crawford was an independent contractor as to the work in which he was engaged at the time of his injury. Mr. Halloran also knew, not only from Crawford himself, but by reason of the advances made by Crawford's attorneys, Mr. Harrison and Mr. Morgan, that Crawford was willing to settle his claim for an amount within the $5,000 limit of the policy. The evidence is that the only offer of settlement which Mr. Halloran made to Crawford was made in the first interview when Crawford was sitting up in bed at his father-in-law's home. The offer was to pay the hospital bill and to pay for having some dental work done and $500. Beyond this the evidence is that Mr. Halloran refused all offers of settlement which came to him from and through Crawford; refused to make any counter offer; and through the company's attorney, Mr. Morrison, let it be known to Crawford's attorney, Mr. Morgan, that the casualty company was not interested in a settlement.

We are satisfied that these facts, if they stood alone, were not sufficient to show that Mr. Halloran or the casualty company acted in bad faith towards the construction company in refusing to avail of Crawford's willingness to make settlement. It was all compatible with the inference that he was merely unwise or mistaken in the light of subsequent events. The doctrine that fraud or bad faith are never presumed, but must be proven, is directly applicable.

There is further testimony, however, claimed to show that Mr. Halloran revealed what his real attitude governing his conduct of the case was and that it was one of bad faith towards the construction company in statements made by Mr. Halloran to Mr. J. J. O'Brien:

Halloran said he thought Crawford was badly injured. He said it would be a bad case to go before a jury in Arizona. He said it was a dangerous case and should not go to a jury; that outside firms in Arizona would have a hard time. He said he realized the man was dangerously injured and it would be a bad case to try. He thought the case should be settled. He said he would agree to a $3,500 settlement, but that the Cook-O'Brien Construction Company would have to pay $1,000 of that settlement. (Mr. J. J. O'Brien, on behalf of the construction company, refused to pay the $1,000.) He said that the case could be settled; it should never go to trial. He said, in his opinion, if the judgment was rendered, it would be in excess of the $5,000 limit of the policy. Although Mr. J. J. O'Brien told Mr. Halloran that the construction company did not want to go to trial but wanted to settle and insisted that Mr. Halloran make the settlement for $3,500, Mr. Halloran refused.

Whether these statements attributed to the agent in charge of the Crawford claim truly reflected the view of the casualty company concerning the merit of the claim, its understanding of the danger to which Crawford's case subjected the policyholder, and the real reason for the refusal to make settlement of the claim within the policy limitation while the control was in the hands of Mr. Halloran, was proper matter of inquiry for the jury.

The judgment in the first trial of the Crawford case was set aside by the trial court because an error had been committed in bringing to the attention of the jury the fact that the case was defended by an insurance company. Some time after the death of Mr. Halloran, a Mr. Rhoades succeeded to the position as agent for the casualty company at Phoenix. The attorney for the casualty company who tried the case the first time, Mr. Morrison, also died during the period between the first and second trial, and Mr. J. Early Craig, of the law firm of Chalmers, Fennemore & Nairn, succeeded to the representation for the casualty company as to the Crawford case. The record shows that from the time of the first trial of the Crawford case, in July of 1926, up to the time of the second trial, in September of 1927, no attempt was made to settle the case with Crawford or his attorneys, but on the eve of the second trial, and immediately before impaneling a jury,

an offer to settle for $6,500 was made through Crawford's attorneys. This opportunity to settle was not availed of. It is evident that the representatives of the casualty company and the construction company's former superintendent, Mr. J. J. O'Brien, who were at the trial, wanted to accept the settlement, but, when Mr. J. J. O'Brien telegraphed the home office of the construction company for authority to pay the difference between the $5,000 policy limit and the $6,500 offer, a conference was held between an officer of the construction company and an agent of the casualty company at Kansas City. A telegram was produced which the casualty company sent about the time to its attorneys who were defending the case in Prescott, Ariz., stating: "Assured received wire stating Rhoades and Crawford's attorneys trying to effect compromise stop Information we have indicates case should be successfully defended stop Wire me immediately your opinion." Two witnesses for the construction company say that the construction company authorized payment of the $1,500 demanded above the $5,000 limit of the policy, and directed that settlement offered be accepted, but witnesses for the casualty company say that the opportunity to settle was lost through the fault of the construction company in not authorizing payment of the required $1,500 excess. The evidence shows clearly that at the time of the second trial the only hope of the attorneys for the casualty company was for a low verdict in favor of Crawford, and that they favored and recommended the acceptance of the $6,500 offer on condition that the construction company would pay the surplus over the policy limit. The testimony is, therefore, in sharp conflict on the question whether this opportunity to settle was lost through the fault of the casualty company or the construction company. We need not decide whether the testimony concerning the failure to effect a settlement of the Crawford case at the time of the second trial, if it stood alone, would have been sufficient to uphold the verdict and judgment in this case. At that time the casualty company was in control of the defense and had had such control of the defense for the construction company, pursuant to its indemnity policy, for more than two years, and the whole course of its conduct was within the scope of the inquiry before the jury upon the question of its alleged bad faith.

We are satisfied that there was, on the whole, sufficient testimony from which reasonable men would be justified in drawing the inference that the casualty company's failure to settle the Crawford claim was not in good faith in the exercise of an honest discretion and judgment, but was in bad faith, in breach of the duty it owed to its insured under the relationship arising from its taking control pursuant to the policy agreement.

■ Error is assigned in the refusal of the District Court to exclude the statements attributed to Mr. Halloran by the witness J. J. O'Brien to the effect that Crawford was badly injured; that his case was a bad case to go before a jury in Arizona; a dangerous case, and should not go to a jury; and he thought the case should be settled; and that it could be and should be settled for $3,500, etc. It is argued that Mr. J. J. O'Brien was incompetent to testify to these statements made by Mr. Halloran in the course of the transactions then being carried on between Mr. Halloran for the casualty company and Mr. J. J. O'Brien for the construction company, because of the provisions of the statute of Missouri where the trial was held. That statute, it is contended, rendered Mr. J. J. O'Brien incompetent to testify to the transactions, because Mr. Halloran was then deceased.

The section 1723 of the Rev. Stat. of Mo. 1929 (Mo. St. Ann. § 1723, p. 3994), relied on, removes the common-law disqualification of a witness in any civil suit or proceeding at law or in equity by reason of his interest in the event of the same as a party or otherwise. It also provides that, in actions where one of the original parties to a contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him. It also provides that no party to a suit whose right of action or defense is derived to him from one who is subject to the foregoing disqualifications shall be admitted to testify in his own favor, and it also restricts the giving of testimony by parties in suits against executors and administrators. The witness J. J. O'Brien, who testified, was not shown to have ever had any interest in the case or in any cause of action involved in the case, and was not even an employee at the time he testified. In the transaction about which he testified, he was acting only as the agent of the Cook-O'Brien Construction Company. The transaction was entirely between the Cook-O'Brien Construction Company and the Maryland Casualty Company. Mr. Halloran was simply an agent of the casualty company. Neither Mr. O'Brien nor Mr. Halloran were parties to the suit or

proceeding, or to any contract or cause of action in issue between the casualty company and the construction company. Neither did the cause of action set up by the casualty company in this case, nor that set up by the construction company, derive to either of said companies from Mr. Halloran or Mr. J. J. O'Brien. Although it is elaborately argued that the decisions of the Supreme Court of Missouri construing the statute are to the effect that Mr. J. J. O'Brien would be an incompetent witness, our review of the many cases cited from that state has not persuaded us that any construction has been clearly or consistently announced by the Supreme Court of Missouri which would exclude a totally uninterested person like Mr. J. J. O'Brien from testifying to transactions in which he never had a personal financial interest, where he manifestly had no hope of gain or fear of loss either on account of the transactions to which he testified or on account of the litigation in which his testimony is adduced. On the contrary, it appears to us that under the reasoning of the Supreme Court of Missouri in Wagner v. Binder, 187 S. W. 1128, and Freeman v. Berberich (Mo. Sup.) 60 S.W. (2d) 393, Mr. J. J. O'Brien's testimony was competent in Missouri.

Two other agents of the casualty company, the attorney Mr. Morrison, and a Mr. Crittenden, had died, and the same objection is urged against admission of statements attributed to them by disinterested witnesses. We hold the objections not well taken.

■ Error is assigned upon the refusal of the trial court to give to the jury instructions requested for the casualty company, upon which request the trial court made the record: "The plaintiff has requested instructions from 'A' to 'L' inclusive, which the court in a large measure has given, but to the extent that any one of them is not given an exception is allowed the plaintiff." By instruction F it was requested that the jury be instructed that there could be no finding of bad faith on the part of the casualty company prior to the date of the receipt of a certain letter, Exhibit 5, if the jury believed that the Cook-O'Brien Construction Company wrote the letter on or about August 3, 1925. As great insistence is put upon the claimed error of the trial court in refusing to give this instruction, comment upon the relevant evidence is necessitated.

There was testimony for the casualty company offered to show that the construction company was concerned about the high rate it had to pay for its employer's liability insurance, and was therefore concerned to minimize the losses, and particularly that it did not want to settle the Crawford case, as that would be something more to reflect the high rate. The construction company had bought this insurance, as it had bought its other insurance for fifteen years, through the Phister Insurance Company, which was the general agent for such underwriting for the Maryland Casualty Company in Kansas City. There was testimony tending to show that officials of the construction company, in frequent communication with the officers of the Phister Company, made no complaint about the handling of the Crawford case by the casualty company, but, on the contrary, approved it. When the large judgment had to be paid, the construction company made a request directed to the Phister Company that the casualty company should share in the payment of the excess above the $5,000 policy limit. Mr. Phister referred the matter to his attorney, Mr. Harris. Mr. Harris obtained the correspondence file from the casualty company, and gave an opinion upon which the casualty company declined to make any contribution. Mr. Harris testified that he had seen in that file a letter signed in the handwriting of R. E. O'Brien, Secy.-Treas., of the construction company, referring to the Crawford accident, as follows: "This accident was caused by individual carelessness. These two employees were working at a considerable distance from the rest of our gangs. Before putting them on this work our superintendent tried them out on some other shooting and found them to be very careful. We hope your company will hold up any settlement with these men until thorough investigation has been made, and avoid paying if possible anything on the claim." And a copy of the letter was received in evidence and was the letter referred to in the instruction requested. There is no question of the competency of this testimony or of its tendency to sustain the claim of good faith on the part of the casualty company. On the other hand, the writer of the letter was on the high seas and could not be called to testify at the time of the trial. His letter was not addressed to the casualty company but to the Phister Company, and the evidence is that the Phister Company had nothing to do with the handling of the Crawford claim by the casualty company, and it does not appear that the letter was intended for the casualty company or its claim department, or constituted any part of any correspondence carried on between the construction company and the casualty company concerning the Craw-

ford claim, nor does it appear that the conduct of the casualty company was in any wise affected by the letter.

As it was framed, the instruction would have required the jury to disregard the declarations which the casualty company's agent, Mr. Halloran, had made to the construction company's agent, Mr. J. J. O'Brien, to the effect that he (Halloran) knew that Crawford's was a bad case which should be settled and could be for $3,500; and also the testimony that Halloran refused to settle the case unless the construction company would contribute $1,000 of the $3,500 necessary to effect proper and desirable settlement; such testimony being the most direct and persuasive testimony offered by the construction company supporting claimed bad faith on the part of the casualty company. But the evidence is clear that at the time Mr. R. E. O'Brien wrote the letter, Exhibit 5, above, he did not know of the existence of this evidence of bad faith on the part of the casualty company. It appears from the testimony of Crawford that both before and after the date of the letter, Exhibit 5, he was evincing to Mr. Halloran complete willingness to settle the case for an amount well within the policy limit, and Halloran, notwithstanding his stated views of the case, was persisting in refusing to settle and save the construction company harmless. The state of the Crawford matter on the ground in Arizona and the attitude of Mr. Halloran in the case was continuing. It is clear from Mr. J. J. O'Brien's testimony that he had not communicated the situation or the conduct of Mr. Halloran until the home officers of the construction company came down on the work. Mr. R. E. O'Brien, it appears, never was on the job in Arizona. It was impossible, therefore, that he could have known of Halloran's conduct or of Halloran's view of the matter upon which so much of the claim of bad faith is predicated at the time he wrote the letter, Exhibit 5. On the other hand, there was testimony for the construction company to the effect that its officer Mr. Luke W. O'Brien was in frequent communication in Kansas City with the officers of the Phister Company, as well as with the Kansas City claim agent of the casualty company, and this witness testified at length to having made many complaints about the way in which the Crawford claim was being handled, of having requested leave to send some one down there for the construction company, and of having frequently urged that the case be settled.

The issue of fact, therefore, as to what the attitude of the construction company was towards settlement of the Crawford claim was to be determined upon conflicting testimony, as well as the bearing of that attitude upon the ultimate issue whether the casualty company was in bad faith refusing to settle. There could be determination only on consideration of all the testimony, including the letter, Exhibit 5, and the many details and circumstances brought out in the testimony of the various witnesses.

The letter, Exhibit 5, is not, in terms, a direction from the construction company to the casualty company not to settle the Crawford case. It contained a clear declaration that Crawford was an employee, and, in so far as it refers to negligence, the reference to "individual carelessness" is somewhat ambiguous. To the extent that it reflects what the attitude of the writer was at the time in regard to the settlement of the case, it was competent and entitled to consideration by the jury. But the trial court did not err in refusing to tell the jury that the writing of the letter proved that there had been no bad faith on the part of the casualty company up to that time. Such an instruction would have taken from the jury the right to pass upon the weight to be given to the letter and what inference they should draw therefrom, and, the issues being issues of fact, the instruction would have been erroneous. Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Baltimore & Ohio R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; Corsicana Nat. Bk. v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141; Asher v. U. S., 63 F.(2d) 20 (C. C. A. 8); Bank of Union v. Fidelity & Casualty Co. of N. Y., 62 F.(2d) 1040 (C. C. A. 8); Wabash R. Co. v. Lewis, 48 F.(2d) 519 (C. C. A. 8); Wisconsin & Arkansas Lumber Co. v. Day (C. C. A.) 35 F.(2d) 563. The whole issue as to bad faith of the casualty company, not only prior to the date of the letter, but throughout the whole period while the casualty company had control of the case, was for the jury, and it was not for the trial court to define the weight to be given to a particular item of testimony, whether written or oral. Western Coal & Mining Co. v. Berberich, 94 F. 329 (C. C. A. 8); Trumbull v. Erickson, 97 F. 891 (C. C. A. 8); Connecticut Mut. Life Ins. Co. v. Hillmon, 107 F. 834 (C. C. A. 8); Chicago, M. & St. P. Ry. Co. v. Anderson, 168 F. 901 (C. C. A. 8); Northern Central Coal Co. v. Barrowman, 246 F. 906 (C. C. A. 8); Louisville & N. R. Co. v. Bell, 206 F. 395 (C. C. A. 6); Grand Trunk Ry. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485; Rio Grande Western Ry. v. Leak, 163 U. S. 280, 16 S. Ct. 1020,

41 L. Ed. 160; Perovich v. U. S., 205 U. S. 86, 27 S. Ct. 456, 51 L. Ed. 722; 14 R. C. L. 780; Minneapolis Gen. Elec. Co. v. Cronon (C. C. A.) 166 F. 651, 20 L. R. A. (N. S.) 816 (C. C. A. 8); Union Pacific R. R. Co. v. Hadley, 246 U. S. 330, 38 S. Ct. 318, 62 L. Ed. 751.

■ Complaint is made of refusal to give instructions G and H requested for the casualty company. In substance, the requests were that the casualty company could not be charged with bad faith in not paying out the full limit of its policies for a settlement if it, in good faith, believed that there was a defense to the action of Crawford, or if there was testimony which, if believed to be true, would have been a defense to said action.

Whether under policies like the present, wherein it is agreed to insure against claims although wholly groundless, false, or fraudulent, and to take control of investigation, settlement, etc., in all cases, it may be said as an abstract proposition of law that the insurance company cannot be guilty of bad faith refusal to settle whenever it honestly believes there is a defense, need not be decided. In this case the instructions requested to be given were not applicable to the issues presented by the pleadings or the evidence. The defense of the casualty company to the set-off of the construction company was pleaded in its reply and no allegation thereof tendered the issue requested by the instructions. Nor did the testimony require submission of the issue. Three claim agents handled the Crawford claim on the part of the casualty company; Mr. Halloran, whose testimony has been commented on, Mr. Darner, who is not shown to have done or said anything about it, and Mr. Rhoades, who knew nothing about it until the time of the second trial, when he recommended the $6,500 settlement. The testimony concerning the attitude of the attorney, Mr. Morrison, who tried the case the first time for the casualty company, is that "after the case was first filed and turned over to Mr. Morrison, early in November of 1925, he said he would like to have seen the case settled. That this kind of cases were dangerous in Arizona." There was no expression by counsel to the casualty company or otherwise reflecting legal opinion that there was a good defense.

We think that the court properly instructed the jury upon the real issues actually presented in the case, as follows:

"If you find that under all the facts and circumstances, as they were then known or should have been known to the Maryland Casualty Company, there was not a probability, a reasonable probability, that a judgment ultimately would be had against the Cook-O'Brien Construction Company in excess of the amount of coverage of the policy of insurance, or if you find that although there was the opportunity to make a settlement, a reasonable settlement, and although there was a probability, under all the facts and circumstances then known or which should have been known, that a judgment might ultimately be had, or would ultimately be had against the Cook-O'Brien Construction Company in excess of the coverage, even though you find those facts to be true, if you find that the Maryland Casualty Company did not, in bad faith towards the Cook-O'Brien Construction Company, decline or refuse to make a settlement, then in either of those events your verdict should be for the plaintiff Maryland Casualty Company, and against the defendant upon the issue of whether the defendant is entitled to a set-off in this case."

"If you find, * * * that there was reasonable cause to believe that in all probability he (Crawford) would obtain, ultimately, a judgment for a very large amount, far in excess of the amount of coverage in this policy, against the Cook-O'Brien Construction Company; and if you further find that there was an opportunity to effect a reasonable settlement, a settlement reasonable from the standpoint both of the Maryland Casualty Company and of the Cook-O'Brien Construction Company, with Crawford, and a settlement within the limits of the coverage of the contract of insurance with the Cook-O'Brien Construction Company, or which would not require the Cook-O'Brien Construction Company to pay more than the amount of its coverage—if you find that all of those facts existed, and if you further find that the Maryland Casualty Company declined, refused, to effect such a reasonable settlement—if you find that one might have been made—and if you further find that in so declining and refusing to effect such a settlement, the Maryland Casualty Company was acting not in good faith toward the Cook-O'Brien Construction Company, but in bad faith as to the Cook-O'Brien Construction Company—if you find all of those facts, then you may return a verdict for the defendant in this case upon its set-off against the plaintiff."

The requested instructions, not being applicable to the issues or the evidence, were properly refused. Grady v. St. Louis Transit Co. (C. C. A.) 169 F. 400; William Sebald Brewing Co. v. Tompkins, 221 F. 895 (C. C.

A. 6); Himrod v. Ft. Pitt Min. & Mill Co., 238 F. 746 (C. C. A. 8); Hercules Powder Co. v. Rich, 3 F.(2d) 12 (C. C. A. 8); Union Pac. Ry. Co. v. Garner, 24 F.(2d) 53 (C. C. A. 8); Grand-Morgan Theatre Co. v. Kearney, 40 F.(2d) 235 (C. C. A. 8); United States Fidelity Co. v. McCarthy, 50 F.(2d) 2 (C. C. A. 8); Kennedy Lbr. Co. v. Rickborn, 40 F.(2d) 228 (C. C. A. 4); Hines v. Jasko, 266 F. 336 (C. C. A. 3); Lamson v. Beard, 94 F. 30, 45 L. R. A. 822 (C. C. A. 7); J. W. Bishop Co. v. Dodson, 152 F. 128 (C. C. A. 4); Toledo, St. L. & W. R. Co. v. Kountz, 168 F. 832 (C. C. A. 6); Boston & Maine Ry. v. Baker, 236 F. 896 (C. C. A. 1).

█ It is further assigned that the set-off of the construction company was not pleadable in the case brought by the casualty company upon the indemnity agreement under the Missouri statute which reads (section 837, Rev. Stat. Mo. 1929 [Mo. St. Ann. § 837, p. 1110]): "If any two or more persons are mutually indebted in any manner whatsoever, and one of them commence an action against the other, one debt may be set off against the other, although such debts are of a different nature."

The argument is that the construction company did not have an existing claim or cause of action against the casualty company at the time the casualty company instituted its action, and so there were no mutual debts to be set off against each other within the meaning of the statute.

The record does not disclose that the casualty company made any objection at any time before trial against litigating the whole controversy between itself and the construction company in the one action. Upon the filing of the set-off by the construction company, the casualty company joined issues thereon by reply. The testimony was taken for a number of days upon the issue so joined, and it was never suggested to the trial court that there was any objection to the procedure until after the testimony was all in. The point is now attempted to be raised upon alleged error in the refusal to instruct the jury. The request was simply to instruct the jury "that the evidence offered by the defendant as an off-set against the claim set out in plaintiff's petition was no defense to such action, and that the jury can not allow or consider any off-set to the plaintiff's petition."

If there had been merit in the point, appellant raised it too late. We are also satisfied that no substantial right of the casualty company was prejudicially affected by the litigation of the whole controversy in the one

action. 28 USCA § 391. It also appears that the quoted Missouri statute, as construed by the Supreme Court of the state, does sanction the set-off in question. Fricke v. Supplies Co., 220 Mo. App. 623, 288 S. W. 1000.

█ We find no error in permitting the Arizona statute to be read to the jury.

On careful consideration of all assignments of error, we are persuaded that none should be sustained, and the judgment is affirmed.