## UNITED STATES v. NEWCOMER.
### No. 10196.

Circuit Court of Appeals, Eighth Circuit.
July 5, 1935.

Fendall Marbury, Sp. Asst. to the Atty. Gen. (Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., Armistead L. Boothe, Atty., Department of Justice, of Washington, D. C., and Edwin G. Moon, U. S. Atty., of Des Moines, Iowa, on the brief), for the United States.

F. E. Northup, of Marshalltown, Iowa (W. D. Kearney, of Marshalltown, Iowa, on the brief), for appellee.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

GARDNER, Circuit Judge.

This is a war risk insurance case, in which the court denied appellant's motion for a directed verdict, and, on submission of the case, the jury returned a verdict in favor of appellee.

We shall refer to the parties as they were designated in the lower court.

The instructions are not embodied in the record, and we must assume that they correctly presented the issues for determination of the jury. The denial of the government's motion for a directed verdict is the only error relied upon. This necessitates a review of the evidence. The jury having found for plaintiff, we must view the evidence in the light most favorable to him, giving him the benefit of such favorable inferences as may reasonably be drawn therefrom.

It was stipulated in the lower court that plaintiff enlisted in the United States Army May 19, 1917, was honorably discharged February 1, 1919; that while in the service he was granted a contract of war risk insurance in the sum of $10,000; that the premiums were paid until March 1, 1919, and that the policy lapsed within thirty days thereafter, unless plaintiff was at that time permanently totally disabled. It was also stipulated that legal disagreement existed between plaintiff and defendant upon this war risk insurance contract.

As the policy lapsed April 1, 1919, for failure to pay the premium due, unless the plaintiff, at or prior to that time, became permanently totally disabled, he is not entitled to recover in this case. He claims permanent total disability since June 22, 1918, as the result of a basal skull fracture resulting in paralysis of the spine, impairment of memory, traumatic epilepsy, and general inability and disability.

The evidence shows that while plaintiff was in the service he fell in an airplane crash on June 22, 1918, resulting in a basal skull fracture, which rendered him unconscious for practically three weeks. His contention is that the disability from this injury was total and permanent, while the government claims that it was neither total nor permanent at any time during the life of the policy.

Dr. Trey, called on behalf of plaintiff, testified to having been called to treat him because he had convulsions or epileptic seizures. Based upon the history of the case, including the airplane accident and his physical examination, which showed irregularity of the skull, he gave it as his opinion that "the predisposing cause of this condition was this airplane accident causing a cranial injury. * * * The immediate effect upon his brain of an injury such as he received, followed by a long period of unconsciousness, would show undoubtedly a skull fracture, with some considerable hemorrhage, and a possible injury to the brain tissue itself. Lapse of memory must be due to something in the brain in the nature of a lesion. I think this was due to the injury to the cranium."

Dr. Lynn, called for plaintiff, testified that he had known plaintiff eight or ten years since the war, and lived next door to him and saw him frequently. Based upon an examination of the plaintiff, and his personal history, the witness said: "His history would indicate it (epilepsy) probably resulted from a skull injury, as the predisposing cause. I know that history. I know that he had an indentation in his skull at the top of his head. I examined his cranium and saw that condition. In relation to the condition I found in his skull, it is, of course, impossible to say that that caused it, but it frequently does, and the assumption was that the epilepsy was the result of the injury. I think that it was the cause."

During the last two months of plaintiff's service, he was under the care of Dr. William O. Krohn, who prescribed as treatment a combination of alternate mental and manual work, and as a part of this treatment plaintiff attended Coe College, where he majored in Psychology. He had been a student at Coe College before he enlisted. It was understood, not only by the government's physician, Dr. Krohn, who had charge of his case, but by the college authorities, that he was doing this college work as a part of his treatment. In the official report of Dr. Krohn on this case appears the following: "The first treatment, as will be recalled, that I suggested for Sergeant Newcomer, was manual employment where, through the activity and coordination of his hands and eyes, a certain amount of attention, memory and judgment could be restored. The college work, along the lines of English Composition, Elementary Science work, and the review of some former study, all of which was not to occupy more than half-time work of the healthy, normal student, was for the same purpose. In other words, work at Coe College as a student was recommended not so much for the acquisition of knowledge as for the training of the nervous system and mind and restoration of certain mental activities that were previously extensively affected as a result of his accident while a soldier in line of duty."

In illustrating the patient's mental lapses, the doctor in this report said: "For example—if told to place his hat on the chair, walk around the examining table three times, open the door of the examining room and close it again, come back to the examiner and stand at attention, he always leaves out one or two elements of the directed act."

Dr. Krohn was an Army officer, and made his tests and examination on behalf of the government.

Prof. Newell, who taught Psychology at Coe College, testified, among other things, as follows: "My chief attention was to treat him as a subject. * * * I had observed his handicap, namely the difficulty with recall, that is memory. I believed it to be a general breakdown of association patterns in his brain, which was associated with his failure to recall what he had learned immediately before, and perhaps his failure to retain. * * * He had only slight retentive faculties so he could use them in the future. * * * He did not assimilate in the same degree as other students what was brought out in ordinary class room work. He was very dependent, as has been brought out in court here, on some little mechanical device, a little memoranda, and seemed to be a slave to it. I never found him when he was not in possession of it. He was apparently conscious of his failings."

Miss Outland, teaching Journalism and English, was one of plaintiff's instructors. She testified as follows: "I found he had no routine nor ideas, except about his own condition. * * * I got an ordinary calendar with the day of the week and the day of the month, and we had to get the fraternity men to watch and see that he only tore one page on a day. He didn't have any memory at that time, practically. He would walk down the street in the morning and say, 'I want to ask you something,' and take out the book I had taught him to use, and ask me, and he would leave me at the office door, and ten minutes later he would come in and say, 'Good morning,' and we would have this all over again. * * * It was two years before he could go anywhere on the campus except to my office without having the building and number of the room written down. He was vacant in his mind when he first came under my instruction."

Dr. Bailey, who had observed plaintiff during a period of some eighteen months, said that he had a blank expression in his eyes, indicating failure of his memory to function; that he was not in condition to take up any line of work because of his inability to coordinate ideas and various events, and also the time of reaction of his mind. "Speaking only as to the time he

was under my observation, I would say he could not do any work that would require judgment or coordination—that is from March 1st, 1922 to June, 1923."

Mr. Blakeley, a practicing lawyer at Cedar Rapids, who knew plaintiff at Coe College, said it was with difficulty that he attended his classes; that his fellow students assisted him in recalling the times when he was to attend classes and what classes he was to attend; that a notebook system was devised whereby his associates would make up his routine for the day, and he would carry that in his pocket and follow the routine. The witness, among other things, said: "At times we were called upon by strangers from downtown to come and help direct him home. There were repeated calls to escort him home."

The government urges that plaintiff's work record is inconsistent with his total permanent disability during the life of the policy. It appears from the evidence that during the summer months of 1919, 1920, and 1921, he ran a drill press in an automobile accessories factory. He was also employed with Warfield, Pratt, and Howell for two or three years, receiving, however, no compensation whatever from them for his work. The case is a peculiar one, in that plaintiff's disability cannot be measured by his physical well being, because it is attributable to his mental condition.

A witness who was employed at the Cooper Manufacturing Company while plaintiff was attempting to work there said of him: "All he did was to operate a drill press. If he would leave his machine and go and get a drink he would not know where his machine was, or where he had been working, and would have to be showed. He would carry his lunch, and there was a little grocery store, and I would take him over and bring him back when he would get a bottle of milk, and he could not find his way. He would get lost. He knew the place after he got there, but if he would go there and start back, he couldn't find the factory again. I was familiar with the type of work he was doing at the factory. Whether or not there was a change of drills depends on whether or not there is a change of jobs. The foreman usually saw to that. Bert couldn't do it himself. It was out of the question. I think his father brought him back and forth to the shop, and on one or two occasions I took him almost home, because he lived out in my direction. I talked with him on different occasions. His conversation was very disconnected. He couldn't stick to one subject and he would forget what he was talking about, and I would remind him. Sometimes he would get one thing on his mind and tell me a half dozen times a day, and didn't know he had told it before."

Substantially the same testimony is given by another witness who was associated with him at the Cooper Manufacturing Company. The secretary and treasurer of that company testified that he supervised and saw the plaintiff at work; that he was not able to do the work that an average employee would be permitted to do; that he had to be assisted in his work; that the assistance came from fellow employees, the foreman, and the superintendent; that he was not compensated on the basis of his work, but that "the basis of our employing him at all was by reason of his being a war service man, and we desired to assist him under the circumstances. From my observation, we could not continue to use him in that kind of employment, because he could not do the regular work we had in the shop. * * * The other men in the shop looked after him. They took him home from work, and brought him to work, and they assisted him in the work he had to do. They kept their eye on him, and helped him get along in the shop. From my observation, he could not have carried on this work without such assistance."

There is no doubt that plaintiff was at the time of the trial totally permanently disabled because of his epileptic condition, which the jury may well have believed was of traumatic origin. His mental deficiencies, however they may be described, were all traceable to the fracture at the base of the skull which he received while in the service on June 22, 1918. All the conditions which were evidenced by his later disability were then present, and hence the evidence of the extent and permanency of his disability after the lapse of the policy bears directly upon the conditions which existed prior to its lapse, and which resulted in his total disability which was then inevitable. To what extent these physical injuries would be reflected by mental conditions was a subject on which only prophets and oracles of the intellect could speak. During the life of his policy, his permanent total disability may have been latent, but it was none the less real for that reason.

What is said by Judge Sanborn, speaking for this court, in Eggen v. United States (C. C. A. 8) 58 F.(2d) 616, 619, is here apposite. It is there said: "This is not saying that if an insured had a total disability resulting from a disease which was during the life of the policy believed to be curable, but which was, in fact, at that time incurable, he might now show that what was believed to be a total and temporary disability was in fact, because of conditions which were not recognized, a total and permanent one. If an insured during the life of his policy was totally disabled because of severe headaches, the cause of his disability being unknown or improperly diagnosed, and if conditions subsequent to lapse demonstrated that this disability, which was regarded as temporary prior to lapse, was in fact then permanent because of some incurable condition, such as a brain tumor, there could be a recovery upon the contract. * * * The subsequent events may be such in point of time or circumstance as to constitute evidence of the conditions upon which the disability existing during the life of the policy was based."

So here the substantial evidence warranted the jury in finding that plaintiff's injury was such in fact as to render him permanently totally disabled. True, medical testimony produced by the government tended to discredit that produced by the plaintiff, it being contended that plaintiff's condition is a "convenient amnesia," and that he was a malingerer, or that he was suffering from hysteria; but at most this testimony raised a question of fact which the jury has decided in favor of the plaintiff. His work record, if plaintiff's disability was dependent upon his physical well being, would be a serious barrier to his recovery; but plaintiff's disability results from his mental deficiencies which are directly traceable to traumatic origin. His mental condition prevents him from working as other human beings work. He is not monarch of his mind. There is lack of co-ordination between his mind and his body, and as said by us in Asher v. United States (C. C. A. 8) 63 F.(2d) 20, 23: "True, the record shows that insured has been able to do some work. He could do some work like the ox of the field, when guided and directed, but not as an intelligent human being."

His mental deficiencies also explain the delay in bringing action, so that such delay cannot be said as a matter of law to preclude his right to maintain it. It was a circumstance to be submitted to the jury with the other facts and circumstances in this case.

We conclude that the evidence in the case was such as to make the issue of permanent total disability one for the jury, and the government's motion for a directed verdict was therefore properly denied. The judgment appealed from is affirmed.