FRANK B. CONNET LUMBER COMPANY, a corporation, Appellant,

v.

NEW AMSTERDAM CASUALTY COMPANY, a corporation, Appellee.

No. 15521.

United States Court of Appeals
Eighth Circuit.

July 16, 1956.

Rehearing Denied Aug. 9, 1956.

John Murphy, Kansas City, Mo. (R. Carter Tucker and Tucker, Murphy, Wilson & Siddens, Kansas City, Mo., on the brief), for appellant.

Henry W. Buck, Kansas City, Mo. (W. H. Hoffstot, John R. Gibson, and Morrison, Hecker, Buck, Cozad & Rogers, Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal by the Frank B. Connet Lumber Company, plaintiff, from a judgment for the New Amsterdam Casualty Company, defendant (appellee), entered upon a directed verdict in an action based upon the claim that the defendant, as the insurer of the plaintiff under an automobile liability policy, with a limit of $15,000 for the bodily injury of one person, was guilty of bad faith in the management of the defense of a personal injury action brought by Adolph T. Reimers against the plaintiff, and that, as a result, the plaintiff had been obliged to pay $20,000 of a $35,000 judgment recovered against it by Reimers. The plaintiff asked for both actual and punitive damages. The instant action originated in the Circuit Court of Jackson County, Missouri, and was removed by the defendant to the United States District Court for the Western District of Missouri on the ground of diversity of citizenship.

The event which gave rise to this controversy occurred on August 10, 1949, a clear, bright day, at about 11:30 in the forenoon, on Chelsea Avenue or Trafficway in Kansas City, Kansas, when a 1931 Ford four-door sedan automobile, being driven easterly by Reimers, came into collision with pieces of lumber protruding from the back of an International truck of the plaintiff being backed by David Masters, an employee of the plaintiff, from its lumber yard into the Avenue in a southerly direction.

The truck involved in the collision was covered by an automobile liability policy issued to the plaintiff by the defendant on March 22, 1949. The policy obligated the defendant, subject to the limits of liability specified, "To pay on behalf of the insured all sums which the insured [plaintiff] shall become legally obligated to pay as damages because of bodily injury * * * sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile." The policy also required the defendant to "defend any suit against the insured alleging such injury * * * and seeking damages on account thereof even if such suit is groundless, false or fraudulent"; and provided that "the company [defendant] may make such investigation, negotiation and settlement of any claim or suit as it deems expedient."

The defendant received notice of the accident on the day it occurred or on the next day. The law firm of Morrison, Nugent, Berger, Hecker & Buck, of Kansas City, Missouri, handled such matters for the defendant in that locality. In the investigation of the accident by that firm, a statement was, on August 11, 1949, obtained from David Masters, the driver of the truck, who stated that he was, at about 11:30 a. m. on August 10, 1949, backing the truck south out of the south alley of the plaintiff's lumber yard; that the truck was loaded with about 65 pieces of 2" x 8" and 2" x 6" boards, the longest of which were 26 feet, with a red flag on the end; that these pieces extended about 12 feet beyond the bed of the

truck; that he stopped to let a streetcar, going east on Chelsea, pass the truck; that he then looked to see if there was other traffic; that he saw none; that he was backing the truck at the rate of three to five miles per hour; that he heard the lumber strike a car; that he stopped, pulled the truck off the street, and went to the car that had been hit; that the Reimers Ford had been on the streetcar track; that there were no skid marks; that he (Masters) heard no squeal of brakes or tires and no horn; that the Ford was struck on the left side; that the main damage was a broken left rear window of the Ford; and that one piece of lumber, 2″ x 6″ x 26′, was broken.

A statement was also obtained from Frank Wooldridge, Sales Manager and Secretary-Treasurer of the plaintiff, who stated that, through the window of the lumber yard office, he saw the truck backing out of the lumber yard; that he noticed a Ford automobile driving southeast on Chelsea; that it was not traveling fast; that the Ford just kept going as if the driver did not see the truck; that the driver made no attempt to swerve or turn; that the Ford car was struck on the left side by the lumber protruding from the rear of the truck; that he (Wooldridge) went to the scene of the accident; that the driver of the Ford remained in the car until it had been pushed to the curb to clear the streetcar tracks.

A report of the automobile accident on a form of the defendant, dated August 11, 1949, and signed "Dave Masters, By: Morrison, Nugent, Berger, Hecker & Buck," states, in substance, that the accident was unavoidable; that the name of the injured person was Adolf "Reimer"; that his ribs were "X-rayed and found to be all right—Possible injury to spine"; that he was taken to Bethany Hospital; that Doctor Feehan was called; that Reimers "said he honked his horn." The report contains this statement in conclusion: "Assured was backing lumber truck out of driveway. Truck was loaded with 26 ft. lengths of lumber. Assured did not see anyone coming and backed over half way across Garfield Avenue [evidently meaning Chelsea Avenue] and the lumber struck claimant's car, breaking the left rear window of claimant's car and the lumber striking claimant in the ribs."

Within forty-eight hours from the time the accident occurred, Reimers was interviewed at the hospital. The unsigned report of the interview indicates that Reimers said that he was driving easterly upon Chelsea, going about 15 miles per hour on the right-hand side of the street, about 8 feet from the right curb; that he was following a streetcar; that the truck was backing out of a lumber yard on the north side of the street; that the truck had some long timbers on it; that the truck driver stopped for the streetcar; that he (Reimers) was 15–20 feet behind the streetcar, which was going at the same speed as his car; that he kept on going; that after the streetcar passed the truck, it started backing again; that he did not actually see the truck until just before the collision; that the streetcar, which was on his left, blocked his view; that when he saw the truck he tried to swerve to the right; that the timbers hit the left side of his car, his left arm, shoulder and side; that his arm and shoulder were black and blue; that the impact threw him over into the right front seat and knocked the wind out of him; that his car stopped "in its tracks"; that the police investigated the accident, and took him to the hospital; that his back was injured and pained him "a lot"; that his neck was stiff and both legs felt numb; that the truck driver said he did not see Reimers.

The report of the police of Kansas City, Kansas, who investigated the accident, was to the effect that Reimers' left arm was bruised below the elbow; that the left side of his chest was badly bruised; that his 1931 Ford sedan was driveable; that his age was 29; that he had 15 years driving experience; that Reimers said he did not see the truck backing, because of a streetcar; that the truck driver said he was backing south across Chelsea and did not see the Rei-

mers car; that Reimers was taken to the Police Emergency Hospital and treated by Doctor Williams.

A report of Doctor Williams, dated August 12, 1949, indicates that Reimers had "Bruises to left arm and left side, with possible fracture"; that he was given an "adhesive dressing over rib," and sent home. The record shows that, while under treatment by Doctor Feehan, Reimers was in the hospital for four days in August immediately after the accident, and was again hospitalized briefly in November, 1949, for observation and a spinogram.

Reimers was employed as an outside bill collector by the Mace-Jones Company of Kansas City, Kansas. On August 22, 1949, that company, which was insured for workmen's compensation liability by the Employers Mutual Casualty Company of Des Moines, Iowa, reported the accident to the Workmen's Compensation Commissioner of Kansas, stating that Reimers had sustained injury to his back and chest, and had not returned to work. A "Physician's Report Blank," furnished the Commissioner by Doctor Feehan, stated, in regard to the nature and extent of Reimers' injury: "Pain in cervical area. Pain and considerable swelling of the left elbow. Pain in entire left side. Difficult to take a deep breath. Pain in lumbosacral and dorsolumbar spine. Expectorated blood." The Doctor's diagnosis, as shown in the report was: "1. Bruised left elbow. 2. Severe injury to dorsolumbar spine. 3. Intervertebral disc?" The Doctor also reported that Reimers would need further medical treatment for an indefinite period.

Reimers on January 12, 1950, filed an application for workmen's compensation with the Kansas Workmen's Compensation Commissioner, stating that while he was making calls as a bill collector his automobile was struck by a backing truck loaded with lumber, and that he sustained "Injury to left arm; injury to chest; injury to back resulting in herniated and protrusion of disk [disc] in the lumbar spine."

From the transcript of the evidence taken at a hearing before the Commissioner on February 21, 1950, at which Reimers, his employer and its insurer were all represented by counsel, it appears that Reimers, in answer to the question, "How did your accident occur, briefly?", testified: "I was going down Chelsea Trafficway on a truck [sic] and the truck backed out and hit me in the side. I was following the streetcar on the side, and the streetcar took up the slack and caught me between the truck and the streetcar," and that he received an injury to "Back, arm, and ribs." It appeared at the hearing that the insurer of the Mace-Jones Company had paid to Reimers compensation of $520, was going to pay his medical and hospital bills, and had agreed to pay him $2,500 in addition, in full settlement of his claim for workmen's compensation. Based upon Reimers' expressed willingness to accept the lump sum offered, and upon a medical report made by Doctor Feehan on November 19, 1950, as to the nature and extent of Reimers' injuries,[1] the Workmen's Compensation Commissioner approved a settlement of Reimers' claim for compensation, pursuant to which the Employers Mutual Casualty Company gave him a

1. "Mr. Reimers was admitted to Providence Hospital on November 8, 1949, for further observation and study. A spinogram was done on November 9, 1949 and and the result of the spinogram reveals that he has a retropulsed intervertebral disc at the fourth and fifth lumbar and at the fifth and first sacral segment.

"He was examined on November 10, 1949, by Dr. F. A. Carmichael, Jr., and when he wrote his report to me, he had not had the benefit of seeing the results of the spinogram. It was his opinion that an exploratory operation should be done, however, because of his clinical findings.

"I again saw Mr. Reimers at my office on November 17th, and he expressed himself to me as not being in favor of surgery. Without surgery, I would state that he has a substantial amount of disability, perhaps as much as 35 to 40%."

check for $2,500. This settlement, according to Reimers' counsel, was based upon an estimated fifteen per cent or sixteen per cent body disability rating.

Reimers on April 17, 1950, filed a complaint, subsequently amended, in the Circuit Court of Jackson County, Missouri, against the Frank B. Connet Lumber Company, alleging that the collision between its lumber truck and the Ford automobile of Reimers and the injuries which he sustained were caused by the negligence of the Lumber Company in the operation of its truck. Reimers asked for a judgment of $50,000. He employed the law firm of Dubiner and Gregg, of Kansas City, Missouri, to represent him with respect to his claim for workmen's compensation and his personal injury claim against the Lumber Company.

The allegations of Reimers as to negligence and injuries were denied by answer, and it was alleged that if he sustained any injury in the accident it was caused or contributed to by his own negligence.

On June 16, 1950, the Claim manager of the defendant (New Amsterdam Casualty Company), wrote a letter to the Lumber Company with respect to the Reimers action, calling its attention to the fact that the amount sued for was in excess of the defendant's liability under its policy, and stating:

"Because the amount for which the plaintiff sues is in excess of the applicable limit of your Insurance Policy, you are at liberty (at your own cost and expense) to seek legal advice to protect your excess interest. Should you decide to do so, it is suggested that you have your personal attorney communicate with Morrison, Nugent, Berger, Hecker & Buck, Seventeenth Floor Bryant Building, Kansas City, Missouri, who presently are appearing and defending in your behalf the above referred to litigation."

After the receipt of this letter, William Urich, Vice-President and General Manager of the Lumber Company, called Mr. Buck, who was acting for the New Amsterdam Casualty Company in the defense of Reimers' action, and asked Mr. Buck what to do. Mr. Buck said: "They just don't have a case, there isn't anything to worry about, I don't think you need worry about it." Mr. Urich then said: "Well, what shall we do then, do you think it is necessary for us to employ another attorney?" Mr. Buck replied, "Well, that is entirely up to you." Urich's response was, "If you don't think there is anything to worry about, let's go on as we are, we will leave it up entirely to you."

Mr. Buck, on behalf of the New Amsterdam Casualty Company, assumed complete control of the defense in the Reimers case. He took the position that there was no merit in Reimers' claim; that the accident did not occur, and could not have occurred, in the manner Reimers asserted; that Reimers was contributorily negligent; and that his injuries were fabricated or exaggerated. This position Mr. Buck consistently maintained in his dealings with Reimers' counsel and with the Lumber Company, and throughout the litigation.

The Reimers case came on for trial on May 19, 1952. There had been no suggestion of the possibility of settlement made to Reimers' counsel up to about a month before the trial. At that time there was a conference held in Mr. Buck's office, at which were present Mr. Dubiner and counsel for the Employers Casualty Company, as subrogee of Reimers' workmen's compensation claim to the extent of $3,441. Mr. Dubiner offered to settle the Reimers case for $12,500. Mr. Buck made a small counter offer, which was not acceptable.

Prior to the trial of the Reimers case, Reimers' deposition and those of the Lumber Company's witnesses who knew anything about how the accident happened were taken.

The deposition of Doctor Francis A. Carmichael, Jr., who had examined Reimers, was also taken by him for use at the trial. Dr. Carmichael testified that, in his opinion, Reimers had a protrusion

or rupturing of an intervertebral disc in his lumbar spine, and was totally disabled from carrying on his former occupation; that he. (Dr. Carmichael) had recommended surgery; that the injuries were consistent with the history Reimers gave of the accident and with what he claimed had happened when the lumber came in contact with him.

Mr. Buck had had Reimers examined by Doctor Nicholas S. Pickard, whose report of examination, dated September 14, 1950, was in evidence. Doctor Pickard, among other things, reported that X-rays of Reimers' back revealed no evidence of bone injury or disease; that X-rays made in different attitudes indicated that there was satisfactory motion in the low back. The Doctor stated that, in his opinion, Reimers was a "studied malingerer." Doctor John F. Bowser, a radiologist who had also examined Reimers, reported that Reimers' spine was normal.

On the trial of the Reimers case there was a conflict in the evidence both with respect to the issue of liability and the issue of damages. There was no contention made at the trial that, under the evidence, Reimers was entitled to a directed verdict. There was evidence that Reimers could not have been a short distance behind a streetcar, and there was evidence that his 1931 Ford was in a dilapidated condition and without brakes and without an adequate steering gear. There was also evidence that Reimers was looking down at the dashboard of his car, and not at the road ahead of him, and that there was nothing ahead of him to obstruct his view. A motion for a directed verdict in favor of the Lumber Company was made, but was denied. The jury returned a verdict of $35,000 in favor of Reimers.

Mr. Lyman Field had tried the case for Reimers. He had been employed in the early part of May or the latter part of April, 1952, for that purpose by Mr. Dubiner on behalf of Reimers. The only offer of settlement made by Mr. Buck, until just before the trial, was $2,500.

On the eve of trial the offer was increased to $6,000, and, after the close of Reimers' case in chief, to $9,000. Mr. Field offered to take $15,000, the limit of liability under the policy. Mr. Buck did not accept the offer. Mr. Field was of the opinion that Reimers had a meritorious case and that if the jury found in his favor the damages would exceed $15,000. Mr. Buck did not agree.

The verdict of the jury was returned on May 24, 1952. During the trial of the Reimers case Frank B. Wooldridge, Secretary-Treasurer of the Lumber Company and an eyewitness of the accident, was present during the first four days, and reported to counsel for the defense in the Reimers case at their offices and was there during noon hours. Defense counsel did not discuss with him the danger of the jury returning a verdict in excess of the policy limit if the jury should believe Reimers' evidence. Wooldridge heard Mr. Field, at the close of Reimers' evidence, make an offer to defense counsel to settle the case for $15,000. This settlement offer was not discussed with Wooldridge. The day following this offer Wooldridge heard Mr. Buck ask the office of the New Amsterdam Casualty Company at St. Louis for permission to settle for $10,000. Mr. Buck said that they had "to stand on $9,000." Wooldridge testified: "He did not discuss with me at that time the merits of the case and the dangers to the Connet Lumber Company if the plaintiff's [Reimers'] case and evidence was believed by the jury and a verdict returned in favor of the plaintiff as to whether Mr. Buck still at that time took the position that there was no liability in the case and no injury, he took that [position] all the way through." Wooldridge did not take the position with the Casualty Company or any of its representatives that the $15,000 offer of settlement should be accepted. After the verdict was returned he had no conversation relative to a settlement of the case. He was not advised of the dangers and hazards of the case to the Lumber Company, had no opinion as to what a fair settlement would be, and,

on behalf of the Lumber Company, relied wholly upon counsel for the Casualty Company. Mr. Urich, on behalf of the Lumber Company, made no demand upon the Casualty Company or its representatives that the Reimers case be settled.

Mr. Buck, after the verdict in the Reimers case and on June 3, 1952, made a motion for judgment notwithstanding the verdict or in the alternative for a new trial.

On June 12, 1952, the law firm of Tucker, Murphy, Wilson & Siddens wrote a letter to counsel for the Casualty Company,[2] stating, in effect, that the Lumber Company looked to it for complete liability coverage, in view of its failure to settle the Reimers case within the policy limits.

The motion for judgment notwithstanding the verdict or for a new trial in the Reimers case was based upon three grounds: (1) that Reimers' evidence did

---

2.                               "June 12, 1952.

"Morrison, Hecker, Buck,
    Cozad & Rogers
"1701 Bryant Building
"Kansas City, Missouri

"Attention: Mr. Henry W. Buck and
               Mr. Wm. H. Hoffstot, Jr.

"Gentlemen:

"In regard to the case of Adolph Reimers vs. Frank B. Connet Lumber Company, which you have tried for and on behalf of the New Amsterdam Casualty Company and Frank B. Connet Lumber Company, we beg to advise that Frank B. Connet Lumber Company has been a client of this office for many years, if and when they needed consultation with Missouri counsel. They have now conferred with us about the outcome of the above case and they tell us that on the *eve of trial and before actual trial*, you had *the opportunity of settling* and disposing of this case within the limits of their public liability policy; that they know that you actually conferred with the insurance company and even recommended that the insurance company give you authority up to $10,000.00 to offer in settlement but that the insurance company indicated to you that they would only give you $9,000.-00 authority. This, of course, is hearsay information, but in any event they have information that you could have settled within the policy limits and thereby have given them full and complete coverage and protection; hence, it becomes our duty at this time to advise you and your client, the New Amsterdam Casualty Company, that their assured looks to them for full and complete protection from any and all amounts that may be adjudicated or paid in this case. The purpose of this letter is to give you notice to that effect.

"Our client asked us about giving service in connection with this case from this time on and we advised them that your firm was one of the best firms in this community, that we had the utmost confidence in your firm and that we would recommend that they leave the defense of this case entirely in your hands and that is the decision they have arrived at.

"They tell us that Mr. Lyman Field on the eve of trial and at the courthouse reiterated the statement that they did not want to embarrass the Connet Lumber Company as such in the least, but they did want the insurance company to pay the amount due in the case (this is hearsay too). This kind of comment, however, makes us think that you might still have it within your power to settle and dispose of the judgment that has been obtained within the limits of the policy and we respectfully request that you do everything within your power to get the matter settled.

"Our client does not want to have to pay anything over and above the amount of coverage in this case because under the circumstances it is felt that they should not be required to do so and our client has not agreed to pay anything in addition to the policy coverage; however the writer as counsel and without any direct authority from our client would suggest to you that if settlement at this time involves the payment of an amount over the $15,000.00 coverage and court costs of an amount not to exceed $2,000.-00 or $2,500.00, we would feel that it was our duty in advising our client to recommend that they make some slight contribution of this type rather than take the risk that is incident to such a large judgment.

"With kindest personal regards, and trusting that you will be able to dispose of the case soon and take our clients off the uneasy seat on which they now find themselves at this time, we remain,

                         "Very truly,

                       "Tucker, Murphy, Wilson
                           & Siddens
                             "By:

"RCT:my"

not make a submissible case; (2) that an instruction as to the duty, under Kansas law, to yield the right of way was erroneous; and (3) that the verdict was excessive. Mr. Tucker, Mr. Urich and the Casualty Company were advised of the motion. On August 26, 1952, the State trial judge, before whom the Reimers case was tried, ruled, in substance, that the issue of liability had been one of fact for the jury, but that the instruction given on behalf of Reimers, relative to the right-of-way statute of Kansas was prejudicially erroneous. He denied the motion for judgment, but granted a new trial. He did not rule specifically on the question of the excessiveness of the verdict, but it seems apparent that if the medical evidence of Reimers was believed the verdict could not be said to be excessive.

On August 28, 1952, Reimers appealed to the Supreme Court of Missouri from the order of the trial court granting the Lumber Company a new trial. No effort was made by counsel for the Casualty Company to settle the Reimers case while it was pending in the Supreme Court; and no evidence was introduced in the instant case to show that the Reimers case could then have been settled.

In the Supreme Court of Missouri, two questions were raised: (1) whether the evidence of Reimers made a submissible case; and (2) whether the instruction as to the effect of the right-of-way statute of Kansas was erroneous. Counsel for the Casualty Company on the appeal did not raise the question that the verdict was excessive. The Supreme Court ruled in favor of Reimers as to the questions presented, reversed the trial court, and reinstated the verdict. Reimers v. Frank B. Connet Lumber Co., Mo., 271 S.W.2d 46. In the course of its opinion, the Supreme Court of Missouri said, page 52 of 271 S.W.2d: "The only real issue in the case, submitted by the instructions, was whether plaintiff [Reimers] was barred from recovery by reason of contributory negligence"; and pointed out that the jury were instructed to return a verdict for the Lumber Company if they found that the collision was caused by the negligence of Reimers or by the combined negligence of Reimers and the Lumber Company.

On September 28, 1954, Tucker, Murphy, Wilson & Siddens wrote the following letter:

"September 28, 1954.
"Morrison, Hecker, Buck, Cozad & Rogers
"Seventeenth Floor, Bryant Building
"Kansas City 6, Missouri
"New Amsterdam Casualty Company
"1040 Pierce Building
"St. Louis 2, Missouri
"Re: Adolph Reimers v. Frank B. Connet Lumber Company, No. 43,-410, Supreme Court of Missouri.
"Gentlemen:
"Connet Lumber Company is in receipt of letter dated September 20, 1954, from Morrison, Hecker, Buck, Cozad & Rogers advising of the final judgment of $35,000.00 in the above-captioned case, and advising in effect that you would pay $15,000.00 and completely disregard complete protection to your assured.

"We call your attention to our letter of June 12, 1952, demanding complete protection and insisting upon settlement which then could have been made within the limits of coverage. We called your attention to the fact that you had a firm offer to settle for $10,000.00 before the $35,000.00 judgment and you refused to pay more than $9,000.00. For $1,000.00 difference you took the risk of subjecting the insured to a $35,000.00 judgment. When we learned of this risk for the first time after judgment we offered to contribute up to $2,500.00 but also demanded settlement. You obtained a second chance of settlement by getting a new trial ordered, but no settlement was made and you took a gamble on the final results by appeal and lost. We believe it was your gamble and your risk and that you

should pay the entire judgment, and we so demand.

"Very truly,
"Tucker, Murphy, Wilson & Siddens

"By:
"RCT:my"

After its affirmance by the Supreme Court, the Reimers judgment was paid, $15,000 and costs being contributed by the Casualty Company, and $20,000 by the Lumber Company, that being its liability in excess of the limit of the policy.

There is much more factual detail in the record on appeal in the instant case, but enough has been said to disclose the basis for the Lumber Company's claim that its liability insurer acted in bad faith in handling the defense in the Reimers case; that the question of bad faith was, under the evidence, one of fact for the jury, and not one of law for the court; and that the court erred in directing a verdict for the insurer.

The question which this Court must decide is whether the trial court reached a permissible conclusion in determining that, under Missouri law, the plaintiff had not made a case for the jury.

■ The considered opinion of a trial judge as to a question of the local law of his jurisdiction will be accorded great weight by this Court. It will not adopt a contrary view unless convinced of error. Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Nolley v. Chicago, M., St. P. & P. R. Co., 8 Cir., 183 F.2d 566, 572, and cases cited; Buder v. Becker, 8 Cir., 185 F.2d 311, 315, and cases cited. See also and compare: National Bellas Hess, Inc., v. Kalis, 8 Cir., 191 F.2d 739, 741, certiorari denied 342 U.S. 933, 72 S.Ct. 377, 96 L.Ed. 695; Guyer v. Elger, 8 Cir., 216 F.2d 537, 540–541, certiorari denied 348 U.S. 929, 75 S.Ct. 342, 99 L. Ed. 728; Dierks Lumber & Coal Co. v. Barnett, 8 Cir., 221 F.2d 695, 697; Citizens Insurance Company of New Jersey v. Foxbilt, Inc., 8 Cir., 226 F.2d 641, 643.

■■ This Court is not an appellate court of the State of Missouri and establishes no rules of law for that State. The burden of demonstrating error is upon the appellant, and in a case controlled by local law that burden is a heavy one. Western Casualty & Surety Co. v. Coleman, 8 Cir., 186 F.2d 40, 43.

Both parties rely upon the case of Zumwalt v. Utilities Ins. Co., 360 Mo. 362, 228 S.W.2d 750, and both also cite with approval the decision of this Court in Maryland Casualty Co. v. Cook-O'Brien Construction Co., 8 Cir., 69 F.2d 462, which arose in Missouri.

In the Zumwalt case there was evidence that the liability insurer had been importuned by its insured to settle a personal injury claim, believed to be meritorious, for an amount within the policy limits of liability, but that the insurer failed and refused to do so unless the insured would contribute $2,500 towards the settlement. The Supreme Court of Missouri, in ruling that under the evidence the issue of bad faith was for the jury, said at page 753 of 228 S.W.2d:

"We have reviewed many authorities on the question and think the weight of authority is that where the insurer in a liability policy reserves the exclusive right to contest or settle any claim brought against the assured, and prohibits him from voluntarily assuming any liability or settling any claims without the insurer's consent, except at his own costs, and the provisions of the policy provide that the insurer may compromise or settle such a claim within the policy limits, no action will lie against the insurer for the amount of the judgment recovered against the insured in excess of the policy limits, unless the insurer is guilty of fraud or bad faith in refusing to settle a claim within the limits of the policy. There are cases that hold that the insured is entitled to recover upon proof that the insurer in refusing to settle a claim for damages was guilty of negligence. But this test is rejected in the better reasoned cases and we think rightfully so. Consult cases discussed in 71 A.L.R. 1484 and Nor-

wood v. Travelers Ins. Co., 204 Minn. 595, 284 N.W. 785, 131 A.L.R. 1496."

The decision of this Court in Maryland Casualty Co. v. Cook-O'Brien Construction Co., supra, 69 F.2d 462, which was cited with approval in the Zumwalt case, presented a rather similar factual situation. In the former case the liability insurer defended a personal injury case on behalf of its insured after having declined an offer to settle within the $5,000 limits of its liability policy. The claimant recovered a judgment for more than $12,000, which the insurer paid and then brought suit against its insured to recover what it had expended in excess of $5,000. The insured asserted in its answer that the insurer had not acted in good faith toward it. The trial court submitted to the jury the question of the insurer's good faith in failing to settle the personal injury claim. From a verdict and judgment for the insured, the insurer appealed. Judge Woodrough, who wrote the opinion for this Court affirming the judgment appealed from, after stating in detail the position taken by the insurer in defending its insured against the claim of the injured person and in refusing an offer of settlement, said at page 466 of 69 F.2d:

"We are satisfied that these facts, if they stood alone, were not sufficient to show that Mr. Halloran [claim manager of the casualty company] or the casualty company acted in bad faith towards the construction company in refusing to avail of Crawford's [the personal injury claimant's] willingness to make settlement. It was all compatible with the inference that he was merely unwise or mistaken in the light of subsequent events. The doctrine that fraud or bad faith are never presumed, but must be proven, is directly applicable.

"There is further testimony, however, claimed to show that Mr. Halloran revealed what his real attitude governing his conduct of the case was and that it was one of bad faith towards the construction company in statements made by Mr. Halloran to Mr. J. J. O'Brien [superintendent of the insured]:

"Halloran said he thought Crawford was badly injured. He said it would be a bad case to go before a jury in Arizona. He said it was a dangerous case and should not go to a jury; that outside firms in Arizona would have a hard time. He said he realized the man was dangerously injured and it would be a bad case to try. He thought the case should be settled. He said he would agree to a $3,500 settlement, but that the Cook-O'Brien Construction Company would have to pay $1,000 of that settlement. (Mr. J. J. O'Brien, on behalf of the construction company, refused to pay the $1,000.) He said that the case could be settled; it should never go to trial. He said, in his opinion, if the judgment was rendered, it would be in excess of the $5,000 limit of the policy. Although Mr. J. J. O'Brien told Mr. Halloran that the construction company did not want to go to trial but wanted to settle and insisted that Mr. Halloran make the settlement for $3,500, Mr. Halloran refused.

"Whether these statements attributed to the agent in charge of the Crawford claim truly reflected the view of the casualty company concerning the merit of the claim, its understanding of the danger to which Crawford's case subjected the policyholder, and the real reason for the refusal to make settlement of the claim within the policy limitation while the control was in the hands of Mr. Halloran, was proper matter of inquiry for the jury."

It is apparent that the Cook-O'Brien Construction Co. case—like the Zumwalt case—is one in which it reasonably might be inferred that the insurer, in disregard of the interests of its insured, refused to make an advantageous settlement,

within the limits of its policy liability of a meritorious claim unless the insured would contribute.

It seems safe to say that it would be an unwholesome rule which would permit a liability insurer to be convicted of bad faith for having failed to compromise a personal injury action, justifiably believed by it to be without merit, if the plaintiff in the action should obtain a verdict and judgment against the insurer in excess of its policy liability. Such a rule would virtually have the effect of giving an insured under a limited liability policy unlimited coverage.

It may be that a liability insurer's negligence, misjudgment or lack of foresight in failing to settle, and in defending against, a personal injury claim may be so inexcusable as to justify a finding of bad faith, but we think there was an inadequate evidentiary basis for such a conclusion in this case. Under the evidence in the Reimers case, the jury could have found that Reimers was guilty of contributory negligence. One reasonably could not be convicted of bad faith for believing and asserting that, on a clear, bright day, the operator of an automobile, properly equipped with brakes and steering gear, who collided with a truck load of lumber being backed slowly into the street, was not exercising reasonable care. The inaccuracy of a prophecy as to what a jury will do in the trial of a personal injury case where the evidence is conflicting or gives rise to conflicting inferences does not, in our opinion, justify a finding of bad faith.

Apparently the law of Missouri applicable to a situation such as that involved in this appeal is the same as that of Minnesota. We note that in the Zumwalt case Norwood v. Travelers Insurance Co., 204 Minn. 595, 284 N.W. 785, 131 A.L.R. 1496, is cited with approval. In the Norwood case, the Supreme Court of Minnesota, in reversing a judgment for the insured in a somewhat similar case, said at page 599 of 204 Minn., at page 787 of 284 N.W.:

"This court in common with those in other jurisdictions recognizes that the insured and insurer by indemnity policies similar to the one here involved are placed in such relation to each other that, aside from the contractual obligations of the policy, each owes to the other the duty of refraining from any wrongful and tortious act that would cause injury. * * * "

And in Mendota Electric Co. v. New York Indemnity Co., 175 Minn. 181, 184, 221 N.W. 61, 62, and Lawson & Nelson Sash & Door Co. v. Associated Indemnity Corp., 204 Minn. 50, 56–57, 282 N.W. 481, 484, the Supreme Court of Minnesota said:

"* * * It takes something more than mere mistake to constitute bad faith, particularly with respect to the action of an insurer under a policy of public liability who is not absolutely bound to make a settlement. The right to control negotiations for a settlement must, of course, be subordinated to the purpose of the contract, which is to indemnify the insured within the contract limit. But it takes something more than error of judgment to create liability. There must be bad faith with resulting injury to the insured before there can be a cause of action."

We think that the District Court reached a permissible conclusion in deciding that, under the evidence and the applicable Missouri law, the plaintiff had failed to make a case for the jury on the issue of bad faith.

We would have been better satisfied had the District Court waited until the close of all of the evidence before ruling upon the motion for a directed verdict. See Barnett v. Terminal R. Ass'n of St. Louis, 8 Cir., 200 F.2d 893, 896. The record in this case, however, contains in great detail all evidence which could be of any help to the trial court in determining whether, under the local law, there was an issue of fact for the jury.

The plaintiff has questioned the jurisdiction of the District Court because of the defendant's failure adequately to al-

lege in its petition for removal the diverse citizenship of the parties. Concededly, diversity of citizenship actually existed, and the defects in the defendant's removal papers have now been cured, as is permitted by § 1653 of Title 28 U.S.C.A.

The judgment appealed from is affirmed.